UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Eva C. TEMPLE, Appellant–
Cross–Appellee.

Docket Nos. 05–0165–CR(L),
05–0679(XAP).

United States Court of Appeals,
Second Circuit.

Argued: Sept. 16, 2005.

Decided: May 1, 2006.

William C. Komaroff, Assistant United States Attorney (David N. Kelly, united States Attorney for the Southern District of New York, Katherine Polk Failla, Assistant United States Attorney, of counsel), New York, NY, for Appellee–Cross–Appellant.

Colleen P. Cassidy, The Legal Aid Society, New York, NY, for Appellant–Cross–Appellee.

Before: MINER and WESLEY, Circuit Judges and RAKOFF, District Judge.[1]

Judge WESLEY concurs in a separate opinion.

MINER, Circuit Judge.

Defendant-appellant Eva C. Temple appeals from a judgment of the United States District Court for the Southern District of New York (Chin, J.) insofar as it adjudicates her, in accordance with a jury verdict of conviction, guilty of forcibly assaulting, resisting, or impeding an officer of the United States engaged in official duties, in violation of 18 U.S.C. § 111.

---

1.  The Honorable Jed S. Rakoff, Judge, United States District Court for the Southern District of New York, sitting by designation.

The government cross appeals from the same judgment insofar as it grants Temple's motion for a judgment of acquittal following her conviction by the same jury for willfully oppressing a person under color of law while acting in connection with the revenue laws of the United States, in violation of 26 U.S.C. § 7214.

For the reasons that follow, we reverse the judgment in all respects, resulting in a dismissal of the assault count and reinstatement of the guilty verdict on the oppression count. We remand for further proceedings consistent herewith.

## BACKGROUND

Temple was employed by the Internal Revenue Service ("IRS") as a quality analyst at the time of the incidents giving rise to the criminal charges filed against her in this case. She had been employed for approximately eighteen years prior to her termination for misconduct at the age of forty-seven.

### I. A Threat of Investigation

On March 5, 2003, New York City Police Detectives Montes and Magaldi arrived at the IRS office in Manhattan to arrest Temple on a charge of aggravated harassment. The charge arose from threats of harm allegedly made by Temple to her landlord's management employees. Efforts by the police to have Temple surrender herself had proved fruitless. Upon arrival at the IRS office building, the detectives were met by an agent of the Treasury Inspector General for Tax Administration ("TIGTA"). The agent escorted the detectives to the floor of the building where Temple's office was located. Temple was not at her desk when the detectives arrived but, when she returned, Montes identified himself and informed Temple that they were there to arrest her. The detectives asked Temple to accompany them out of the building voluntarily to spare her the embarrassment of an arrest. Detective Montes testified that, as they approached the area of the elevator bank on the way out, Temple

> became very violent. She became abusive. She used foul language. She jumped in front of my face. Her arms were flailing. She yelled at the TIGTA agent, myself .... She specifically said that we had "no fucking case," ... that this was a dispute between herself and the management company, and I had no business being there.

Fearing an escalation of Temple's violent conduct, the detectives physically restrained and handcuffed her and, with the assistance of the TIGTA agent, brought her down in the elevator and out the front door of the IRS office building. Once outside the building, the detectives placed Temple in the back seat of their car and closed the car door. Temple opened the door and tried to get out. She was reseated, the car's safety locks were engaged and Montes sat in the back seat as Magaldi drove to the 110th Precinct Police Headquarters in Queens.

As she was being transported, Temple continued to scream and yell abusive epithets. At one point, she kicked Montes as they sat in the back seat. During the trip, she told the detectives that she was an IRS employee, with "the ability to initiate investigations and audits into the tax histories" of the detectives. She also stated that there "were a number of brothers and sisters who held a grudge against the NYPD" and that she would contact those employees to audit the detectives' tax returns because of the arrest. Montes reported these threats to Agent McGowen of the TIGTA the next day. Montes testified that he took the threats to be true and gave the following reasons why he consid-

ered the threats significant enough to pass along to Agent McGowen:

> [M]yself and Detective [Magaldi] were a little concerned that this woman having been an IRS employee for that amount of time, coupled with the behavior that we saw, and the belligerence, we became a little worried that perhaps she did have the ability to initiate audits and investigate into our tax histories.

Temple continued to be physically and verbally abusive after she arrived at the police station. According to Montes, Temple "said numerous times throughout that day that the charges themselves were bullshit, that the complaining witnesses themselves were all Hispanic bitches, that I being a Hispanic myself am taking their side and that this was all a racist, I guess you could say a racist scheme against her." Temple complained about her arrest even after she had been placed in a cell. During the booking process, certain comments that Temple made in response to pedigree questions were so outrageous that they made some people in the office laugh. After the booking, Temple was transmitted for psychiatric evaluation by the Emergency Service Unit of the New York Police Department. Subsequently, a psychiatric evaluation was ordered by the District Court, and Temple was found competent to stand trial.

## II. A Threat of Harm

Approximately two months after Detectives Montes and Magaldi arrested Temple for aggravated harassment, the IRS fired Temple for misconduct unrelated to the arrest. The termination of employment was impelled by an incident at the entrance to the IRS office in the William Green Federal Building in Philadelphia on October 23, 2002. Temple was in Philadelphia to attend a meeting. A magnetometer began to ring as she passed through it to enter the building. When the Federal Protective Officer at the magnetometer asked Temple to remove any metal objects on her person, she became angry and started to argue with him. When asked to submit her photo ID, she shouted at the officer and pushed her ID up close to his face. As he attempted to grab the ID, she snatched it from him and left. She returned thirty minutes later, reentered the building, and loudly bombarded the officer with an obscene tirade. Three other officers of the Federal Protective Service were summoned, and one of them asked Temple to reenter the magnetometer. She responded: "I am a government employee and should not be inconvenienced." Ultimately, two of the officers escorted Temple to her meeting.

A letter from the IRS Manager proposing the termination of Temple's employment referred to the incident in Philadelphia as the reason for the termination and advised Temple as follows:

> I am also taking into account the fact that you were suspended for one day on January 22, 1992, for disruptive behavior. You were suspended for nine days beginning November 15, 1993, for insubordination and disruptive behavior. Again, you were suspended for 14 calendar days beginning on March 13, 1996, for disruptive behavior in a bank with which the IRS does business and for misuse of your position and failing to meet your financial obligations.

The letter notified Temple that further information was available from Senior Labor Relations Specialist James Petherbridge. It was Petherbridge who recommended and implemented the decision to terminate Temple, and he was familiar with her entire history at the IRS as well as the circumstances involved in her arrest by the New York City Detectives.

When Temple was terminated from her employment, effective May 7, 2003, she did not turn in her IRS badge identification as requested. She presented that identification to a bank manager at the Bank of New York on June 12, 2003. The manager called Petherbridge to verify that the person he was meeting was in fact Eva Temple. Petherbridge could hear Temple yelling in the background. He confirmed her identity but told the bank manager to keep the identification badge, which Temple was not entitled to have. The manager was unable to confiscate the badge because Temple had already retrieved it from him when the telephone call was made.

Upon arriving at work on the morning of June 13, 2003, Petherbridge found a message that had been placed on his office telephone voicemail by Temple on the afternoon of June 12. The message was placed at 5:12 p.m., after Petherbridge had left work for the day. The message was as follows: "Yeah, you faggot ass bitch ass stupid faggot fuck. I'm gonna fuck you up, you faggot bitch."

Petherbridge testified that he was "basically petrified" after he heard the message and explained his fear as follows: "I was well aware of her actions when she was arrested, her beating up the detectives in the car and the fact that she had threatened to hurt or kill her former landlord and child. So that led me to have great concerns about my own safety." Petherbridge immediately notified his manager as well as Agent McGowen of the TIGTA about the message. McGowen testified that, when he interviewed him, Petherbridge "appeared nervous, scared," and "was concerned that [Temple] was going to assault him." In his testimony, Petherbridge said that he "basically was afraid and had lunch the next week in [his] office because [he] was really afraid to go out."

It does not appear that he had any further contact with Temple.

### III. Indictment and Subsequent Proceedings

Temple was charged in a two-count indictment dated July 17, 2003. In Count One, she was charged with a violation of 26 U.S.C. § 7214 in that she, as an employee of the IRS,

acting in connection with the revenue laws of the United States, did willfully oppress a person under color of law, to wit, the defendant unlawfully, willfully and knowingly threatened two New York City Police officers, who were arresting her for aggravated harassment and other charges, to wit, she threatened that she would initiate an IRS audit of their tax returns as a way to seek revenge.

In Count II, Temple was charged with a violation of 18 U.S.C. § 111 in that she unlawfully, willfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with a person designated in 18 U.S.C. § 1114 while engaged in and on account of the performance of official duties, to wit, EVA C. TEMPLE left a threatening message on the voicemail of the Internal Revenue Service officer handl[ing] her termination from IRS employment and thereafter sought to have the defendant's IRS employee identification confiscated.

Following her conviction on both counts by jury verdict on July 14, 2004, Temple moved for a judgment of acquittal on both counts pursuant to Fed.R.Crim.P. 29. She moved in the alternative for a new trial pursuant to Fed.R.Crim.P. 33. In a written opinion, the District Court granted the Rule 29 motion as to Count One and denied both motions as to Count Two. *See United States v. Temple*, 342 F.Supp.2d 233, 236 (S.D.N.Y.2004). In its analysis of

the Count One conviction, the District Court observed that the government is required to prove three elements to establish a violation of 26 U.S.C. § 7214(a)(1): "[F]irst, at the time of the acts alleged, the defendant was an officer or employee of the United States; second, the defendant was acting in connection with a revenue law of the United States; and third, the defendant willfully oppressed a person under color of law." *Id.* at 238. The District Court determined that there was no dispute as to the first element—that "Temple was an employee of the IRS." *Id.* The District Court determined as to the second element that "a reasonable jury could have found that Temple was acting in connection with the revenue laws because her threat to the detectives involved IRS audits." *Id.* With respect to the third element, the District Court determined that willful oppression under color of law was not established. *Id.* at 239.

With respect to the government's failure to establish the third element, the court reasoned as follows:

Although Temple clearly acted willfully and in an attempt to interfere with the detectives' efforts to arrest her and transport her to the precinct, her actions were not "clothed" with authority and she was not acting under "color of law" in any meaningful sense. Her tantrum was not part of the performance of any actual or pretended duty, and she was not empowered—actually or even apparently—to punish the officers for arresting her.

To the contrary, Temple had no power or authority, and it was clear in the circumstances here that she did not. Indeed, she had already been placed under arrest and handcuffed. She engaged in an incoherent outburst and eventually was treated as an emotionally disturbed person: a police department

emergency services unit was summoned, and the Unit considered using a Taser gun to subdue her. The officers were laughing at Temple and eventually they took her to a psychiatric hospital for evaluation and treatment. Throughout this series of events, Temple called one of the detectives by the wrong name. *Id.* at 240.

In further support of its conclusion that "no reasonable jury could have found that Temple willfully oppressed the detectives under color of law," *id.* at 239–40, the District Court noted the following factors: that Temple was on notice that the IRS was proposing to remove her from service; that she had been previously disciplined for other incidents; that her employment was therefore precarious even prior to her arrest; and that there was nothing in the record to show that her employment as a program analyst enabled her to initiate audits of tax returns. *Id.* at 240.

In its discussion of the Count Two conviction, the District Court enumerated four elements that require proof by the government:

first, the targeted individual was a federal officer or employee; second, the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with the federal officer or employee; third, the defendant acted knowingly and willfully; and fourth, the federal officer or employee was engaged in the performance of his official duties or that the assault or interference occurred on account of the performance of his official duties.

*Id.* at 241. Finding no dispute as to the first, third, and fourth elements, the District Court focused on the second element. *Id.* Noting that an immediate threat of force is sufficient to meet the "forcible" requirement of the second element, the District Court framed the issue as follows:

Ultimately, the issue is whether the government's evidence showed that Temple forcibly intimidated or interfered with Petherbridge in or because of the performance of his duties. That turns, in part, on whether the voicemail left by Temple posed an immediate or imminent threat to Petherbridge.

*Id.* at 242.

In finding that the requirement was met, the District Court determined that the words "I'm gonna fuck you up" were an expression of an immediate or imminent threat of harm in view of the surrounding circumstances. *Id.* These circumstances included the following: that the message tone was angry and harsh; that there was a sense of immediacy in Temple's voice; that Temple knew the location of Petherbridge's office and had the ability to gain access to it; and that the telephone call was made on the same day that Temple presented her expired IRS credentials to a bank. *Id.* The District Court concluded that "a reasonable jury could have found that Temple might very well have been in the building or across the street or somewhere else nearby, waiting for Petherbridge to leave work at the close of the business day, when she placed the telephone call." *Id.* The District Court also found it significant in this regard that Petherbridge actually ‚was intimidated by the voicemail, *id.,* and that Temple's actions were clearly of the type the statute was designed to protect, *id.* at 243.

On December 15, 2004, the District Court sentenced Temple on Count Two, a Class A Misdemeanor, to time served (imprisonment for approximately seven weeks), supervised release for one year, and a mandatory assessment of $25.00.

## ANALYSIS

I.  *The Rule 29 Standard*

█ Federal Rule of Criminal Procedure 29(a) allows a district court to enter a judgment of acquittal with respect to "any offense for which the evidence is insufficient to sustain a conviction." We review the grant or denial of a judgment of acquittal de novo, and we apply the same standards governing the sufficiency of the evidence as are applied by a district court. *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003); *United States v. Reyes,* 302 F.3d 48, 52–53 (2d Cir.2002). Accordingly, "the very nature of ... motions [for acquittal pursuant to Rule 29] is to question the sufficiency of the evidence to support a conviction." *United States v. Gjurashaj,* 706 F.2d 395, 399 (2d Cir.1983). The test established by the Supreme Court requires us to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Put another way, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (internal quotation marks omitted).

In assessing the evidence, a court is constrained to bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* at 129 (internal quotation marks omitted; alterations in original). Where a jury has rendered a verdict of guilty, the duty of a court passing on a Rule 29 motion is to "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might

have drawn in favor of the government." *United States v. Walker,* 191 F.3d 326, 333 (2d Cir.1999) (internal quotation marks omitted). A "heavy burden" therefore must be borne by one who would challenge a guilty verdict. *United States v. Si Lu Tian,* 339 F.3d 143, 150 (2d Cir.2003) (internal quotation marks omitted).

▇▇▇▇ Where a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) (internal quotation marks omitted; alteration in original). Conversely, "in passing upon a motion for directed verdict of acquittal, ... if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted." *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972) (quoting *Curley v. United States,* 160 F.2d 229, 232–33 (D.C.Cir. 1947).)

## II. *The Oppression Count*

▇▇▇▇ Applying the foregoing principles, we conclude that the District Court erred in granting a judgment of acquittal following the jury verdict of guilty on Count One of the Indictment. Count One charges a violation of 26 U.S.C. § 7214, which provides in pertinent part as follows:

> Any officer or employee of the United States acting in connection with any revenue law of the United States—(1) who is guilty of ... willful oppression under color of law ... shall be dismissed from office or discharged from employment and, upon conviction thereof, shall be ... imprisoned not more than five years
> ....

26 U.S.C. § 7214(a)(1).

The District Court properly determined that there was evidentiary support for a jury finding that the first two elements of the offense were satisfied, viz. that Temple was an employee of the United States and that she was acting in connection with the revenue laws by threatening the detectives with an IRS audit. The District Court erred, however, in concluding that there was a lack of evidentiary support for the third element—willful oppression of the detectives under color of law. Since this is a case of first impression in regard to the interpretation of "willful oppression under color of law" in the context of a criminal prosecution under § 7214(a)(1), we turn to some commonly held concepts to illuminate the phrase.

"Willful" repeatedly has been defined in the criminal context as intentional, purposeful, and voluntary, as distinguished from accidental or negligent. *See Black's Law Dictionary* 1630 (8th ed.2004). Evil intent or bad purpose are not implicit in this definition. *Id.* "Oppression" includes the "unjust or cruel exercise of authority or power." *Merriam–Webster's Third New International Dictionary, Unabridged* 1584 (1993). In criminal law, it is "[a]n abuse of office committed by a public official." OXFORD ENGLISH DICTIONARY ONLINE, http://dictionary. oed.com/ entrance.dtl (search for "oppression") (definition from the June 2004 Draft Revision to the 1989 Second Edition) (last visited February 27, 2006). For a definition of the phrase "under color of law," we turn to the cases interpreting 18 U.S.C. § 242 and 42 U.S.C. § 1983, the criminal and civil statutes prohibiting the deprivation under color of law of rights protected by the Constitution and laws of the United States. While "color of law" under these statutes refers to actions taken under color of state law, we think that the tests established in the cases pertinent to these statutes are helpful in determining whether an action is

taken under color of federal law for purposes of § 7214(a)(1). We therefore substitute "[federal]" for "state" when quoting from the cases.

■ We have noted that [t]he Supreme Court has broadly interpreted the color of law requirement, concluding that "[m]isuse of power, possessed by virtue of [federal] law and made possible only because the wrongdoer is clothed with the authority of [federal] law, is action taken 'under color of [federal] law.'"

*United States v. Walsh*, 194 F.3d 37, 50 (2d Cir.1999) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Color of law and pretense of law are synonymous, and acts of officers engaged in "personal pursuits" are not included. *See Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Although no "bright line" separates actions taken under color of law from personal pursuits, *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir.1994), the "relevant question" in determining whether an action was taken under color of law "is not whether the [action] was part of the defendant's official duties but, rather, whether the [action] was 'made possible only because the wrongdoer is clothed with the authority of [federal] law,'" *Walsh*, 194 F.3d at 51 (quoting *Classic*, 313 U.S. at 326, 61 S.Ct. 1031). One who abuses a position given to him or her by the government is said to act under color of law. *West v. Atkins*, 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Such is the case, for example, "where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department." *Pitchell*, 13 F.3d at 548.

In determining that the color of law requirement had not been met, the District Court relied on *Hughes v. Halifax County Sch. Bd.*, 855 F.2d 183 (4th Cir.1988). In *Hughes*, the plaintiff claimed that "he was assaulted, battered, and subjected to intentional emotional distress under color of state law because he was accosted by county employees." *Id.* at 186. The county employees were co-workers employed by the maintenance department of the school district. In rejecting a claim that the co-workers were acting under color of law, the Court in *Hughes* distinguished cases involving judges and police officers: "The judges were figuratively and literally clothed in state power, and the officers were acting behind badges. [The co-workers] were wearing, at best, county coveralls. The indicia of state authority just isn't the same." *Id.* at 187.

*Hughes* is not analogous to the case at bar. Temple's employment by the IRS clothed her with the indicia of authority while the co-workers' employment in positions of equal rank with the plaintiff in *Hughes* did not. The District Court also found that Temple had no power or authority because she was arrested and handcuffed when she threatened the detectives. *Temple*, 342 F.Supp.2d at 240. But this fact does not establish that the threats were not made under color of law. The District Court also found it significant that, some time after the threat was made, some personnel at the police precinct laughed while Temple was responding to pedigree questions, and that she was at one point treated as an emotionally disturbed person. *Id.* These events perhaps indicate in retrospect that the detectives should not have taken Temple's threats seriously. Yet, they testified that they did in fact take the threats quite seriously. Moreover, these later events do not gainsay the fact that the detectives knew of Temple's employment with the IRS and had no reason to doubt that she would carry out her threats as she made them in the police car on the way to the precinct.

Recently, in *United States v. Giordano*, 442 F.3d 30 (2d Cir.2006), a case involving sexual abuse of minors by a mayor, we held that the mayor acted under color of law by "actively and deliberately us[ing] his apparent authority as mayor to ensure that the victims did not resist or report the ongoing abuse." *Id.* at 47. The evidence here, insofar as it pertains to "color of law," is even more compelling than it was in *Giordano*. Here, there was a specific and direct threat under the guise of apparent authority, while in *Giordano* it appears that no specific and direct threat to invoke official authority ever was made.

In this regard, the District Court's observations—that Temple was on notice that the IRS had proposed to remove her from service, that she had been disciplined several times, that her employment was "precarious" when she was arrested, and that there was no basis in the record to conclude that Temple had authority to initiate an audit of the detectives' returns, *Temple*, 342 F.Supp.2d at 240—do not support the conclusion that Temple was not clothed with the authority of federal law. The detectives were unaware of *any* of these matters as they transported Temple and as she made her threats. They knew only that she was an employee of the IRS. To them, she was authorized to speak as a representative of her agency. Her oppressive conduct was indeed made possible by her perceived ability to invoke the real or apparent authority of her department.

We have said, in another context, that "Section 7214 imposes sanctions on revenue agents for departures from the high standards of conduct demanded by those holding that office." *United States v. Stern*, 418 F.2d 198, 199 (2d Cir.1969) (per curiam). Temple's egregious, obnoxious, unprofessional, and, indeed, oppressive behavior represent a significant departure from those standards. In any event, we

are unwilling, under the circumstances revealed, to agree with the District Court that no rational jury could find that Temple acted under color of law. *See United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir.1991) (holding that, in case involving an assault by an off-duty police officer on his wife's boyfriend, a rational jury could find that the officer acted under color of law).

### III. *The Forcible Intimidation Count*

■ 18 U.S.C. § 111(a)(1) penalizes anyone who

> forcibly assaults, resists, opposes, impedes, intimidates or interferes with any [officer or employee of the United States] while engaged in or on account of the performance of official duties.

We have said that this provision "must be read as prohibiting any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties." *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987). Although a touching is not required within the meaning of § 111 and a threat of physical injury is sufficient, the threat must be accompanied by an apparent present ability to inflict the injury and a "reasonable apprehension of *immediate* bodily harm." *United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir.1999) (emphasis supplied).

■ Where the evidence permits an inference that a reasonable person standing in the place of the threatened official would have feared "*imminent* bodily harm," the official's state of mind need not be established by explicit testimony. *United States v. Walker*, 835 F.2d at 987 (emphasis supplied). An implied threat to use force sometime in the indefinite future does not fill the bill. *Id.* at 988.

In *Walker*, with respect to the requirement of immediacy, we approved an in-

struction, given in the following terms, that the threat must be of present harm:

> [T]he threat of bodily harm in the future—there was some testimony about "I will get you after work," etc., that is not the kind of thing that would be sufficient under the law. You have to find that there was a present threat, immediate threat for you to find the forcible requirement to be met.

*Id.*

In denying the motion for a judgment of acquittal on the Section 111 count, the District Court found sufficient evidence of immediacy in Temple's threat to Petherbridge: "I'm gonna fuck you up, you faggot bitch." *Temple,* 342 F.Supp.2d at 242. This finding was informed by the tone of the message and the "sense of immediacy" conveyed by it as well as by Temple's knowledge of the location of Petherbridge's office, Temple's ability to gain access to that office, and the timing of the telephone call. *Id.* From these factors, the District Court concluded: "Indeed, a reasonable jury could have found that Temple might very well have been in the building or across the street or somewhere else nearby, waiting for Petherbridge to leave work at the close of the business day, when she placed the telephone call." *Id.* The District Court's finding was further informed by its observations that "the evidence showed that Petherbridge was actually intimidated by the voicemail," *id.,* and that Temple's actions were "clearly the type of conduct § 111 seeks to prevent," *id.* at 243.

We think that the voicemail message did not pose the sort of immediate or imminent threat required by the statute. We see little difference between Temple's message and the "I will get you after work" message considered insufficient as an immediate threat in *Walker.* A "sense of immediacy" in a tone of voice cannot substitute for evidence of actual immediacy and mere knowledge of someone's location cannot give rise to an inference of the physical proximity necessary to fulfill the immediacy requirement. In any event, there was no evidence whatsoever as to Temple's location when she left the voicemail message. The requisite apparent present ability to carry out a threat is absent here. The District Court's contrary conclusion is founded largely in speculation.

The cases affirming § 111 convictions generally involve face-to-face encounters. *See, e.g., United States v. Street,* 66 F.3d 969, 977–78 (8th Cir.1995); *United States v. Shedlock,* 62 F.3d 214, 217 (8th Cir.1995); *United States v. Schrader,* 10 F.3d 1345, 1348 (8th Cir.1993); *United States v. Fernandez,* 837 F.2d 1031, 1033 (11th Cir.1988); *cf. United States v. Fallen,* 256 F.3d 1082, 1087–89 (11th Cir.2001) (affirming a conviction where the defendant was located on one side of door with police officers on the other side). Here, the threat was not presented to Petherbridge until he listened to his voicemail some nineteen hours after the message was placed there and, although the subjective fear described by Petherbridge is relevant, it is not controlling. The test is an objective one, viz: whether "*imminent* bodily harm would have been feared by a reasonable person standing in [Petherbridge's] shoes." *Walker,* 835 F.2d at 987 (emphasis supplied). That test was not met in this case, for, although Petherbridge may reasonably have feared harm, he had no objective basis to fear *imminent* harm. We therefore cannot agree with the District Court that Temple's conduct was of the type that § 111 was designed to prevent and conclude accordingly that the District Court erred in failing to grant a judgment of acquittal on Count Two of the Indictment. Since we dispose of this

Count on the basis of evidentiary insufficiency, we see no need to pass on Temple's evidentiary challenges made in relation to this Count.

We have considered Temple's claim of retroactive misjoinder resulting in prejudicial spillover and find it meritless. *See United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir.2003).

## CONCLUSION

We reverse the judgment of acquittal as to Count One of the Indictment and reinstate the jury verdict of guilty thereon. We reverse the judgment of conviction on Count Two and direct the entry of a judgment of acquittal thereon. We remand the case for the re-sentencing of the defendant and the entry of an appropriate judgment consistent with the foregoing.

WESLEY, Circuit Judge, concurring.

I concur in the Court's reinstatement of Temple's conviction under 26 U.S.C. § 7214(a)(1) and its reversal of her conviction for impeding an officer of the United States engaged in official duties under 18 U.S.C. § 111. I write to express my concern that as a result of this case and *United States v. Giordano*, 442 F.3d 30 (2d

Cir.2006), this Court appears to have allowed a victim's subjective beliefs or fears about a defendant's ability or willingness to use his or her public position to cause harm to serve as the basis for finding that a defendant was acting "under color of law." [1] There is no basis for allowing subjective impressions, beliefs, or fears to cloud, much less drive, color-of-law analysis, and doing so will make consistent application of color-of-law statutes in this Circuit difficult, if not impossible.

When two New York Police Department (NYPD) detectives arrested Temple, she asserted that she was an IRS employee with "the ability to initiate investigations and audits into the [detectives'] tax histories", and that there "were a number of brothers and sisters [in the IRS] who held a grudge against the NYPD." The majority opinion concludes these threats were "under color of law." I do not quarrel with much of the majority opinion, including this conclusion, but I would hold that Temple's threats were under the color of law without regard to the detectives' subjective beliefs or fears of whether Temple either did or did not have the ability or the willingness to carry out her threats. It is Temple's *use* of her status as an IRS

---

1. Color of law and state action cases have been described as falling into two broad categories: official capacity cases where the wrongdoer is the state ("use of authority" cases), *see, e.g., Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), and personal capacity cases ("abuse of authority" cases). *See* RICHARD H.W. MALOY, *"Under Color of"—What Does It Mean?*, 56 MERCER L. REV. 565, 599–600 (2005). This case involves the second, more difficult category, "abuse of authority," which sometimes involves individuals not employed by the government. Professor Maloy further divides abuse of authority cases into five sub-categories: (1) "the state actor is an employee or agent of the state with complete authority to take certain action, but the state actor intentionally or negligently misuses that authority," (2) "the state actor is

merely following" a governmental dictate, (3) "the state actor, whether or not an employee or agent of the state, conspires with an employee of the state who is either guilty of the deprivation or has a 'symbiotic' relationship with the state," (4) "the state actor is usually not an employee or agent of the state but is guilty of the deprivation while receiving some benefit from the state," and (5) "the state actor is usually not an employee or agent of the state, but is guilty of the deprivation, having been delegated some authority by the state that is historically ... a 'public function.'" *Id.* at 600. The most common, and most problematic, color-of-law/state-action cases are contained in the first subcategory of personal capacity cases: instances where the state actor misuses or abuses his or her authority. *Id.* at 608.

employee to effectuate the harm the officers suffered—that is, to willfully oppress by threatening to initiate (or have others initiate) an audit—that made her threats "under color of law." It was the nexus between Temple's status and the harm, as evidenced by her objective manifestations, that render her acts "under color of law," and therefore a violation of 26 U.S.C. § 7214(a)(1).

Existing case law, including cases dealing with § 7214 and its prior versions, as well as scholarly commentary, supports the conclusion that Temple's threats were made "under color of law." Temple's threats departed from the IRS's "high standards of conduct demanded of those holding that office," *United States v. Stern,* 418 F.2d 198, 199 (2d Cir.1969), irrespective of the detectives' beliefs or fears. Yet I worry that the majority opinion may be read as implying that the detectives' subjective beliefs or fears that Temple could or would carry out her threats are relevant, even though there is no reason to interject this subjective component into the analysis. Majority op. pp. 138 – 139.[2] As we have held, reliance on a victim's subjective reaction "misses the essence of the color of law requirement." *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

In my view, a determination that a defendant acted under color of law should be based on objective criteria. In other words, in personal capacity cases the application of color-of-law statutes should turn on (1) the defendant's *status* as a public official or state actor,[3] (2) the victim's *rea-* *sonable and objective awareness* of the defendant's status, and (3) the defendant's *use* of the victim's awareness to accomplish the harm. When subjective beliefs or fears are interjected, it is no longer the defendant's status and conduct as a public official or state actor that determines whether a color-of-law statute will apply. Rather, even where the official never mentions or uses his or her position as a government official, a victim's belief or fear, no matter how unreasonable, can result in liability for the defendant. A recent case in this Circuit, *United States v. Giordano,* illustrates this problem.

In *Giordano,* this Court concluded that evidence presented at the trial of the mayor of Waterbury, Connecticut was sufficient to support a conviction under 18 U.S.C. § 242. *See Giordano,* 442 F.3d at 45–47. Section 242 makes it a criminal act to (1) willfully and (2) under color of law (3) deprive a person of rights protected by the Constitution or laws of the United States. 18 U.S.C. § 242. Giordano sexually abused two minor girls, one the daughter of the prostitute he often patronized, the other the prostitute's niece. *Giordano,* 442 F.3d at 33. No evidence was presented that Giordano used or even mentioned his status as mayor to establish or force the girls to engage in sexual activity. The only evidence cited by the majority opinion in *Giordano* for support of its assertion that Giordano used his authority as mayor to sexually abuse the girls was the girls' subjective beliefs and fears that the mayor could use that status to get the girls in trouble. *Id.* at 43–47. Judge Ja-

---

**2.** The district court opinion in the instant case presents the other side of this problem. The district court found that Temple's threats were not under color of law because when she was arrested she was in handcuffs and later her responses to questions at the police station should have led the officers to believe that she could not or would not carry out her threats. *United States v. Temple,* 342 F.Supp.2d 233, 240 (S.D.N.Y.2004).

**3.** This would also include individuals acting as agents on behalf of government officials or individuals conspiring with government officials.

cobs's dissent in *Giordano* ably demonstrates that, although reprehensible, Giordano's conduct was not under color of law because "[a]ll would have happened as it did happen if Giordano had been an architect." *Id.* at 50 (Jacobs, J., dissenting). That is, Giordano's conduct was not under color of law because the "conduct made no critical use of his office." *Id.* It is impossible to read the majority and dissenting opinions in *Giordano* and not reach the conclusion that the majority opinion—by relying so heavily on the victims' subjective beliefs and fears as to Giordano's power and his intention to use that official power—has significantly altered the intended application of color-of-law statutes and made it difficult to predict the situations in which they will now be applied.

Case law supports the proposition that an IRS agent, acting in connection with a revenue law, who uses his or her status as an IRS employee to achieve the harm prohibited by § 7214(a)(1)—willful oppression, in this case by threatening an audit—does

so "under color of law." One will not find extensive discussion of "color of law" in § 7214(a)(1) cases,[4] but rather the vast majority of color-of-law cases deal with 42 U.S.C. § 1983, along with § 1983's criminal counterpart, 18 U.S.C § 242.[5] The general standard is well-settled: "[m]isuse of power, possessed by virtue of . . . law and made possible only because the wrongdoer is clothed with the authority of . . . law is [action] taken under color of law." *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir.1999) (first alteration in the original) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Put simply, " 'color' of law means 'pretense' of law." *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir.1997) (quoting *Pitchell*, 13 F.3d at 547–48); *see also Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). An act can be under color of law even if an official does not have authority to perform the act that leads to the harm, because color of law includes even an official's

**4.** There are only a few cases dealing with "color of law" as used in § 7214(a)(1), but it is not because the statute is new. Misconduct under color of law has been an element in statutes governing IRS employee conduct for over 135 years. The language of modern day 26 U.S.C. § 7214(a)(1) is almost identical to its original, 1868, formulation: "[A]ny officer or agent appointed and acting under the authority of any revenue law of the United States [from] any extortion or wilful oppression, under color of law. . . ." Act of July 20, 1868, ch. 186, sec. 98, 15 Stat. 165 (1868). What cases there are present no instances of prosecutions that were ultimately successful. One case, *United States v. Deaver*, 14 F. 595 (W.D.N.C.1882), lays out the district court's jury charge, including the requirement that the action be "under color of law," without mentioning whether or not the defendant was ultimately convicted. *See also Williams v. United States*, 168 U.S. 382, 388, 18 S.Ct. 92, 42 L.Ed. 509 (1897) (conviction for extortion under color-of-law under one of § 7214's predecessors, 26 I.R.C. § 4047, overturned on appeal because Chinese inspector at U.S. port

was not an officer or agent acting under authority of the revenue laws); *United States v. Waldin*, 139 F.Supp. 156, 158–59 (E.D.Pa. 1951) (prosecution under 26 U.S.C. § 4047(e)(10) not allowed on grounds that tax collector did not use his authority, or even "the color of authority," in scheme to get U.S. Attorney's alleged indictment quashed).

**5.** Even so, the phrase "color of law," or as it has alternatively been called, "color of office" or *"colore officii,"* has an extensive history, both in England and the United States, predating the enactment of the civil rights statutes. STEVEN L. WINTER, *The Meaning of "Under Color of" Law*, 91 MICH. L. REV. 323, 342–356 (1993) (analyzing the phrase's history here and in England and noting that the concept was widely used and accepted in both countries well before its codification). In the United States, reference to an action taken "under colour of law" appears in cases as early as 1788. *See, e.g., Zane's Ex'rs v. Cowperthwaite*, 1 U.S. (1 Dall.) 312, 313, 1 L.Ed. 152 (1788).

abuse of governmental power. *West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). In evaluating whether an act was under color of law, one must assume the official had the authority or power to act if it was the official's governmental status that led to the harm. *Cf. Home Tel. & Tel. Co. v. City of Los Angeles,* 227 U.S. 278, 288–89, 33 S.Ct. 312, 57 L.Ed. 510 (1913). What color of law does not cover are "acts of officers in the ambit of their personal pursuits," *Screws,* 325 U.S. at 111, 65 S.Ct. 1031, and understandably there is no bright line separating those personal pursuits from actions taken under color of law, *Pitchell,* 13 F.3d at 548.

Case law does not, however, support the notion that victims' subjective beliefs drive color-of-law analysis. To do so would eliminate any distinction between acts under color of law and personal pursuits. The most principled application of color-of-law statutes will come only from separating victims' subjective beliefs and fears from the analysis. As noted above, reliance on a victim's subjective reaction "misses the essence of the color of law requirement." *Pitchell,* 13 F.3d at 549. Others have, in part, explained why:

> In the section 1983 context . . . the issue [for determining whether an individual has acted under color of law] is not that the injured party mistakenly thinks that the agent acts for the governmental entity. If it were, then a rapist who lures his victims by flashing a fake police badge would be the subject of constitutional commands, while a police officer who engages in illegal government surveillance while in plainclothes would be acting beyond the reach of those commands. Rather, the problem of conduct *under color of office* concerns the distinctive social meaning occasioned by abuse of official authority. It arises only when the actor has a bona fide

identity as a state official or when he or she acts in concert with such an official.

Steven L. Winter, *The Meaning of "Under Color of" Law,* 91 Mich. L. Rev. 323, 401 (1993) (internal quotations and citation omitted). Introduction of the victim's subjective beliefs or fears regarding whether an official can or will cause a harm as a result of his or her status would mean a defendant would be deemed liable or culpable in situations where there is no nexus between the status and the harm. But outside the context of official-capacity cases, or where the defendant uses the victim's awareness of the defendant's status, there simply is no nexus between status and harm such that the act can be classified as occurring "under color of law." Rather, in those cases lacking the nexus, the act is done by a public official engaged in a personal pursuit.

Allowing victims' subjective beliefs to cloud or drive the analysis will mean that culpability (and presumably subsequent civil liability) would attach in situations, like *Giordano,* where the defendant made no use of his status in molesting the girls. Without using the girls' subjective beliefs and fears that Giordano had the ability and willingness to use his status as a means to effectuate harm, the majority opinion in *Giordano* would be unable to point to a single fact to support its holding. In the case of Temple, it is her conduct, and the use of the detectives' reasonable and objective awareness of her status as an IRS agent to harm them, that drives the analysis, not whether the detectives subjectively believed or feared that Temple could or would carry out her threats.

\*\*\*\*

Instead of considering a victim's subjective beliefs or fears, courts should remain focused on objective criteria, specifically,

the defendant's status, the victim's objective and reasonable awareness of that status, and the defendant's use of the victim's awareness to accomplish the harm. Introducing victims' subjective beliefs or fears into color-of-law analysis will result in the inconsistent and uncontrolled application of statutes prohibiting acts done "under color of law."