09-5195-cr (L)
United States v. Knight

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 1st day of February, two thousand twelve.

PRESENT:    JOHN M. WALKER, JR.,
           CHESTER J. STRAUB,
           DEBRA ANN LIVINGSTON,
                      *Circuit Judges*.

---

UNITED STATES OF AMERICA,
        *Appellee*,

    -v.-                        Nos. 09-5195-cr (L), 09-5198-cr (con), 09-5336-cr (con)

MELVIN RAY LYTTLE,
        *Defendant*,

PAUL E. KNIGHT, VIOLETTE GAIL ELDRIDGE, JOHN L. MONTANA, JR.,
        *Defendants-Appellants*.

---

For Defendant-Appellant Knight:    MARK D. HOSKEN (Jay S. Ovsiovitch, *on the brief*), Federal Public Defender's Office, Western District of New York, Rochester, New York.

For Defendant-Appellant Eldridge:    MAURICE J. VERRILLO, Law Offices of Maurice J. Verrillo, PC, Rochester, New York.

For Defendant-Appellant Montana:    JON P. GETZ, Muldoon & Getz, Rochester, New York.

For Appellee:                    BRADLEY E. TYLER, Assistant United States Attorney
                                 (William J. Hochul, Jr., United States Attorney, *on the brief*),
                                 Western District of New York, Rochester, New York.

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be **AFFIRMED**.[1]

Defendants-Appellants Violette Gail Eldridge ("Eldridge"), Paul E. Knight ("Knight"), and John L. Montana, Jr. ("Montana") appeal from judgments of the United States District Court for the Western District of New York (Charles J. Siragusa, *Judge*), convicting each of them, after trial by jury, of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343; and convicting Eldridge and Knight of conspiracy to launder money in violation of 18 U.S.C. § 1956(h) and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The court sentenced Eldridge principally to 20 years' imprisonment, Knight principally to 14 years' imprisonment, and Montana principally to 6 years' imprisonment. We assume the parties' familiarity with the underlying facts, procedural history of the case, and issues on appeal.

**I. Dismissal of the Money Laundering Charges**

Eldridge argues that, pursuant to *United States v. Santos*, 553 U.S. 507 (2008), the money laundering charges against her should have been dismissed before trial because the relevant financial transactions did not involve the "proceeds" of alleged illegal activity. We review her challenge *de novo*. *United States v. Quinones*, 635 F.3d 590, 597 (2d Cir. 2011). "The federal money laundering

---

[1] In a separate opinion filed simultaneously with this summary order, we address Defendant-Appellant Violette Gail Eldridge's argument that the indictment should have been dismissed on statute of limitations grounds, notwithstanding issuance of a tolling order pursuant to 18 U.S.C. § 3292.

statute makes it a crime to conduct a 'financial transaction' knowing that the property involved in the transaction represents the 'proceeds' of some form of unlawful activity when the transaction in fact involves the proceeds of specified unlawful activity . . . ." *Id.* Although the Justices in *Santos* divided on whether (and when) gross receipts of a criminal enterprise might be "proceeds" for purposes of the money laundering statute, they all agreed that net profits always qualify as "proceeds." *See generally Santos*, 553 U.S. 507.

Eldridge argues that the district court erred in denying her pretrial motion to dismiss. Eldridge's indictment, on its face, does not specify whether the three specific financial transactions charged as money laundering relate to the net profits or gross receipts of the fraudulent enterprise. Nothing in the indictment, however, indicates that these transactions did *not* involve profits; rather, the indictment uses the word "proceeds," which echoes the statute. This wording is not impermissible. "[A]n indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, . . . state time and place in approximate terms." *United States v. Flaharty*, 295 F.3d 182, 198 (2d Cir. 2002) (quoting *United States v. Bagaric*, 706 F.2d 42, 61 (2d Cir. 1983)) (internal quotation marks omitted). As for the money laundering conspiracy count, moreover, several of the overt acts alleged in the indictment clearly relate to "profits," such as the payment of a personal charge account and the purchase of home furnishings. Accordingly, the district court did not err in refusing to dismiss the money laundering charges based on the indictment's face.

## II. Confrontation Clause

Eldridge next argues that the district court erred in admitting transcripts of her codefendants' testimony before the Securities and Exchange Commission ("SEC") on the grounds that the admission of such transcripts violated the Confrontation Clause of the Sixth Amendment. "Alleged violations of the Confrontation Clause are reviewed *de novo*, subject to harmless error analysis." *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006). Where evidence has been admitted in violation of the Confrontation Clause, we will affirm a conviction only if we are persuaded beyond a reasonable doubt that the challenged evidence "did not contribute to the verdict obtained." *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (quoting *United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir. 1989)) (internal quotation marks omitted).

In this multi-defendant trial, the government used the SEC testimony principally against the individuals who gave it, as evidence of their untruthfulness.[2] This use does not implicate the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59–60 & n.9 (2004); *United States v. Logan*, 419 F.3d 172, 177 (2d Cir. 2005); *see also United States v. Stewart*, 433 F.3d 273, 292 (2d Cir. 2006). Granted, at one point in its summation, the government relied upon the SEC testimony of Paul Knight to establish his true relationship with Eldridge by telling the jurors that "Knight's S[E]C testimony demonstrates . . . a continuing participation in a conspiracy with Gail Eldridge."

---

[2] For example, the prosecution told the jury at the end of the trial:
I submit to you, ladies and gentlemen, all of the defendants' S[E]C testimony should be critically reviewed against the evidence presented during the course of the trial, and if you find it to be materially false and self serving, you should disregard it in its entirety. However, the defendants' S[E]C testimony does indicate something else not related to its truthfulness. It demonstrates the defendants' extreme arrogance in believing that anything they say will be believed, regardless of how incredible it is, just because they say it.

4

In the context of the full trial record, however, this use of Eldridge's codefendant's SEC testimony was harmless. Multiple witnesses, including Randall Jacoby, Ronald Petlev, Christopher Quinn, Kurt Slep, and Trutzwel Wolff, testified to Eldridge's role and involvement with her codefendants in the fraudulent scheme. The government's stray use of Knight's prior testimony, even assuming it was error, therefore cannot justify reversal.

**III. Collusion with the SEC**

Relying on *United States v. Kordel*, 397 U.S. 1 (1970), Eldridge next argues that government prosecutors worked closely with the SEC in its civil proceeding, and therefore that the district court should have granted Eldridge's motion to suppress the SEC testimonial evidence or to dismiss the indictment due to collaboration between prosecutors and the SEC. We disagree. Setting aside Eldridge's conclusory assertions, Eldridge does not allege any facts that suggest improper collusion between the SEC and the prosecution in her case. Because there is no indication that the government acted in bad faith, the district court did not err in denying Eldridge's motion. *See id.* at 11 ("It would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial."); *Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994).

**IV. Admissibility of the Trust Management Agreements**

Eldridge next argues that the district court should have admitted certain trust management agreements into evidence to show the nature of her relationship with her codefendants and her alleged lack of knowledge of the fraudulent scheme. Because the agreements were exhibits at the SEC proceedings, Eldridge contends that they should have been admitted under Federal Rule of

5

Evidence 106, which allows for the admission of documents or parts of documents that explain or contextualize other recorded statements (or parts thereof) introduced into evidence. *See* Fed. R. Evid. 106. "We have interpreted Rule 106 to require that a document be admitted when it is essential to explain an already admitted document, to place the admitted document in context, 'or to avoid misleading the trier of fact.'" *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995) (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). Rule 106 requires admission of a document when it is "necessary for the 'fair and impartial understanding of the admitted portion [of the document]' or [a related] document." *Id.* (quoting *Marin*, 669 F.2d at 84). "We will reverse the evidentiary rulings of a district court only if they are manifestly erroneous." *Id.* at 100.

As explained above, the government only once (and only briefly) cited the SEC transcripts for the purpose of establishing the relationship between Eldridge and a codefendant. The trust management agreements therefore were not essential to explain the SEC transcripts, especially because Eldridge points to no particular misunderstandings of the transcripts due to the unadmitted agreements. Indeed, it was Eldridge's counsel who made repeated reference to the portions of the SEC transcripts discussing the trust management agreements, not the government. The district court therefore did not manifestly err in refusing to admit the trust management agreements.

## V. Denial of Severance

Both Eldridge and Montana argue that the district court abused its discretion by denying their motions for severance. If a joint trial "appears to prejudice a defendant[,] . . . the court may . . . sever the defendants' trials." Fed. R. Crim. P. 14(a). "[A] district court order denying a Rule 14 motion . . . will be overturned only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of

discretion." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 131 (2d Cir. 2008) (quoting *United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003)) (internal quotation marks omitted). "To obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." *United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir. 1989). "[E]ven when the risk of prejudice is high, measures less drastic than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Diaz*, 176 F.3d 52, 104 (2d Cir. 1999) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

Eldridge claims that she was prejudiced by the joint trial because the court's admission of SEC testimony allowed her codefendants' out-of-court statements to incriminate her by linking her to the actions of her codefendants. Moreover, she argues, the court's denial of admission of the trust management agreements prevented her from establishing the nature of the agreement she had with her codefendants. As explained above, both of these arguments are meritless. *See supra.* To the extent Eldridge claims the joint trial prevented her from effectively arguing that her role was limited and her codefendants were to blame, she had ample opportunity to make this argument and, indeed, did so.

Montana points out that, unlike his codefendants, he was not charged with money laundering and took home no profits from the scheme; he argues that the evidence relating to his codefendants' money laundering and profits therefore prejudiced him. He also argues that the indictment was highly complex and confusing, which led jurors to impute the actions of Montana's codefendants to him. However, the judge told the jury no fewer than three times that Montana was not charged

7

with money laundering and that they should only consider evidence of Montana's commission of the charged offenses. We presume that jurors follow their instructions. *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009). The district court therefore did not abuse its discretion in denying severance.

**VI. "Good Faith" Jury Instruction**

Eldridge argues that the district court erred by failing to instruct the jury properly regarding her good-faith defense to the mail and wire fraud charges. "We review *de novo* the propriety of jury instructions. 'A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.' Reversal is required only if the instructions, viewed as a whole, caused the defendant prejudice." *United States v. Naiman*, 211 F.3d 40, 50-51 (2d Cir. 2000) (quoting *United States v. Walsh*, 194 F.3d 37, 52 (2d Cir. 1999)) (citations omitted) (internal quotation marks omitted).

Here, Eldridge rightly asserts that good faith is a defense to the charges of mail fraud and wire fraud. The district court, however, expressly instructed the jury that "good faith on the part of a defendant is a complete defense to a charge of mail or wire fraud." Although this was not the precise wording that Eldridge requested, it stated the same substantive defense and was fair and accurate. The jury instruction was therefore not erroneous.

**VII. Sufficiency of the Evidence**

Eldridge, Knight, and Montana each argue that the evidence was insufficient to establish their guilt of the charged offenses. "The test for sufficiency is whether, as to a given count, a 'rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting United *States v. Jackson*, 335 F.3d 170,

8

180 (2d Cir. 2003)). We must view the evidence in the light most favorable to the government, which entails "crediting every inference that the jury might have drawn in favor of the government." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006)) (internal quotation marks omitted).

Eldridge argues that the evidence did not establish that a criminal agreement existed between her and her codefendants. Multiple investors, however, testified that her codefendants told them that Eldridge was the "trader" (or was the intermediary with the trader). Moreover, Christopher Quinn testified to talking directly with Eldridge about the allocation of his mother's funds. Michael Fine testified that Eldridge disbursed funds through his law firm's escrow account to Knight. And Agent Kassouf testified to tracing funds from investors into investment accounts controlled by Eldridge. While Eldridge asserts that none of the charged crimes was established beyond a reasonable doubt, the numerous witnesses' accounts of her involvement, plus the documentary and testimonial evidence described above, easily demonstrate that a reasonable juror could have found otherwise.

Montana similarly argues that there was no evidence that he knew of the crimes or the conspiracy, especially in light of the fact that he received no money. However, investors testified that Montana promised that he was directly involved in the program, that he met with the traders, and that "he has been involved in these transactions to successful conclusions and that they were running at that moment and making money for clients of his other joint partners." Paula Tepedino, Montana's secretary, testified that Montana talked and met with his codefendants on various occasions. Moreover, Tepedino testified that Montana said he created a new investment program himself and said that he could "do it on his own without Mel [Lyttle] or Paul [Knight]." This testimony, considered in conjunction with the other evidence, was more than sufficient for a

9

reasonable juror to have concluded that Montana knew of the fraud and conspired with his codefendants to perpetrate it.

Knight argues first that while he was admittedly involved with his codefendants in offering the investment program, there was insufficient evidence to prove that he intended to harm the investors. He claims that he believed the program would actually help the investors earn money. Second, Knight argues that the evidence does not show that he intended to promote unlawful activity within the meaning of the money laundering statute. Third, Knight contends that there was insufficient evidence that he agreed with his codefendants to commit mail or wire fraud. These arguments regarding Knight's mental state are refuted by the evidence offered to the jury. Investors testified that Knight told them that his program was private and secret, and that they would be killed if the investment program was exposed to the media. Randall Jacoby testified that Knight told him that his "funds would be locked up and [he] would be arrested for perjury" after he sent Knight a letter demanding the return of his investment. Investors also testified that Knight said that he had other clients who were successfully generating returns. A reasonable juror could have concluded, based on this and other evidence, that Knight knew the program would harm investors, intended to promote mail or wire fraud, and agreed with his codefendants to do so.

**VIII. Sentencing**

Eldridge, Knight, and Montana challenge their sentences as procedurally and substantively unreasonable. "While factual determinations underlying a district court's Guidelines calculations are reviewed for clear error, a district court's application of the Guidelines is reviewed *de novo*." *United States v. Conca*, 635 F.3d 55, 62 (2d Cir. 2011). "[W]hen a party fails to raise a sentencing issue in the district court, we review for plain error." *United States v. Folkes*, 622 F.3d 152, 156 (2d

10

Cir. 2010).  Further, we review sentences for substantive reasonableness under a "deferential abuse-of-discretion standard."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (internal quotation marks omitted).  "[W]e will not substitute our own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and "will . . . set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions."  *Id.* (internal quotation marks omitted).

Eldridge argues that her 20-year sentence is harsh and unreasonable under the totality of the circumstances.  Specifically, she disputes the factual basis for each of the enhancements, and she argues that the district court should have adjusted downward further for overlapping adjustments and for her age (65 years old at the time of sentencing), her health concerns, and for her record of community service.  She also argues that the district court should have departed downward with respect to her criminal history because her only other conviction was subsequent to her indictment in this case.  These arguments are without merit.

With regard to the enhancements, Eldridge does not point out any specific facts that she disputes; "merely incorporating by reference an argument presented to the district court, [or] stating an issue without advancing an argument," does not suffice to raise an issue for appellate review.  *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).  As to the overlapping adjustments, the district court's decision not to depart more than four points from the advisory offense level of 41 was well within its discretion.  *See United States v. Jackson*, 346 F.3d 22, 25–26 (2d Cir. 2003).  Next, age, health, family ties, or community involvement generally only justify a downward departure in "unusual" or "extraordinary" cases, such as serious infirmity.  *See* U.S.S.G. § 5H1.1, .4, .6, .11.  The

11

district court did not abuse its discretion in declining to depart downward based on these factors in Eldridge's particular case.  Finally, Eldridge does not contest the factual basis for the court's finding of a criminal history level of II; the district court did not abuse its discretion in deciding not to depart from the Guidelines based on the fact that Eldridge's only other criminal conviction occurred after the indictment in the present case.

Montana argues that his six-year sentence is unreasonable because he received no profits and was not involved in the "daily activity and operations" of the conspiracy, especially in light of his age, health problems (diabetes and high blood pressure), and lack of prior criminal history.  The district court, however, did not abuse its discretion in determining that his circumstances were not so unusual or extraordinary to justify a downward departure for his personal characteristics.  *See* U.S.S.G. § 5H1.1, .4, .6.  Montana also argues that "the actual investor money lost, according to the record, is $13,615,012, which is less than the $20 million excess as set forth in § 2F1.1(b)(1)(Q)."  For sentencing purposes, however, "loss in fraud cases includes the amount of property taken, even if all or part has been returned."  *United States v. Coriaty*, 300 F.3d 244, 251 (2d Cir. 2002) (quoting *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997)) (internal quotation marks omitted).  The government showed that more than $30 million had been invested in the fraud.  The evidence also shows both that the scheme was complex and that transactions were concealed, despite Montana's assertions to the contrary.  Finally, Montana contends that "[h]e did not have a public or private trust to abuse."  But the evidence at trial showed that many investors trusted him with their savings, and that he lied to them and abused their trust, despite having a fiduciary relationship with them.

Knight argues that the district court should not have applied the sophisticated means enhancement because his personal involvement was unsophisticated. The evidence, however, shows that Knight helped to construct an intricate façade of secrecy and a false image of success. Moreover, funds were often transferred through him to his co-conspirators or to investors. Knight also claims that he did not organize, lead, manage, or supervise the conspiracy. The Guidelines Manual, however, notes that "[a]n upward departure may be warranted" for someone who "exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, comment. This Court reviews a district court's application of § 3B1.1 for clear error because the issue is "predominantly factual rather than legal." *United States v. Gotti*, 459 F.3d 296, 349 (2d Cir. 2006). The evidence and testimony amply demonstrated that Knight managed a significant amount of money for the conspirators; the district court did not clearly err in applying an enhancement for Knight's role in the offense.

**IX. Ineffective Assistance of Counsel**

Finally, Montana argues before this Court that his trial counsel was unconstitutionally ineffective because he failed to obtain investment experts and because he stipulated to the SEC testimony and related documents. "When faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Because this Court has a "baseline aversion to resolving ineffectiveness claims on direct review," *id.* (quoting *United States v. Salameh*,

152 F.3d 88, 161 (2d Cir. 1998)) (internal quotation marks omitted), we decline to consider the argument at this time.

We have considered all of Defendants-Appellants' remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is hereby **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

14