07-1453-cr
United States v. Hertular

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: June 19, 2008                                    Decided: April 6, 2009)

Docket No. 07-1453-cr

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ROBERT HERTULAR,

*Defendant-Appellant*.

Before:

STRAUB, RAGGI, *Circuit Judges*, and SESSIONS, *District Judge*.[1]

_____

Appeal from a judgment of conviction entered in the United States District Court for

the Southern District of New York (Buchwald, *Judge*).  Through counsel, defendant

challenges (1) the sufficiency of the evidence supporting guilty verdicts on counts of (a)

---

[1]  The Honorable William K. Sessions III, Chief Judge of the United States District
Court for the District of Vermont, sitting by designation.

1

forcibly impeding or intimidating a federal officer, see 18 U.S.C. § 111, and (b) obstruction of justice, see id. § 1512(b)(3); (2) the district court's charge on obstruction of justice; and (3) the reasonableness of his sentence. Defendant raises myriad other challenges in a pro se submission.

We identify a sufficiency error with respect to the guilty verdict for forcibly impeding a federal officer, which requires us to reverse that count of conviction and to remand the case for resentencing. In all other respects, we reject defendant's arguments as without merit.

AFFIRMED IN PART, REVERSED IN PART, AND VACATED AND REMANDED IN PART.

ANIRUDH BANSAL, Assistant United States Attorney (Jesse M. Furman, Katherine Polk Failla, Assistant United States Attorneys, *of counsel*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

AVROM ROBIN (Ira D. London, *of counsel*), Law Office of Ira D. London, New York, New York, *for Defendant-Appellant*.

REENA RAGGI, *Circuit Judge*:

Defendant Robert Hertular appeals from a judgment of conviction entered on April 4, 2007, by Judge Naomi Reice Buchwald after a jury trial in the United States District Court for the Southern District of New York. Hertular stands convicted of four crimes: (1) conspiracy to import five kilograms or more of cocaine, see 21 U.S.C. §§ 952(a), 963; (2)

distribution of five kilograms or more of cocaine, knowing that it would be imported into the United States, see id. §§ 959(a), 960(b)(1)(B)(ii); (3) forcibly impeding or intimidating a federal officer, see 18 U.S.C. § 111; and (4) obstruction of justice, see id. § 1512(b)(3). He is presently incarcerated serving a non-Guidelines prison term of 400 months (33-1/3 years). Through counsel, Hertular challenges his conviction on the grounds that (1) the trial evidence was insufficient to support the jury's guilty verdicts on the counts of (a) forcibly impeding or intimidating a federal officer and (b) obstructing justice; (2) the district court erroneously instructed the jury on the elements of obstruction of justice; and (3) the 400-month sentence is infected by procedural error and, in any event, is substantively unreasonable. In a pro se submission, Hertular raises myriad other challenges.

Because we conclude that the trial evidence, even when viewed in the light most favorable to the government, was insufficient to support a guilty verdict under the § 111 count (Count Three), we are obliged to reverse the conviction on that count and to vacate the sentence and to remand for resentencing in light of that reversal. We reject Hertular's remaining appellate arguments as without merit and, therefore, affirm his conviction in all other respects.

I.    **Background**

A.    Evidence Supporting the Challenged Counts of Conviction

The trial evidence convincingly demonstrated that in the period between 2001 and

3

January 2004, Belizean national Robert Hertular conspired with others to import more than six tons of cocaine into the United States. Because Hertular raises no sufficiency challenge to his conviction on the conspiracy and substantive counts of narcotics trafficking, we do not detail this evidence further. Instead, we focus on the evidence adduced to prove the challenged counts of forcibly impeding or intimidating a federal officer and obstruction of justice. We summarize that evidence in the light most favorable to the government. See, e.g., Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Jones, 531 F.3d 163, 166 (2d Cir. 2008).

### 1. 2001: Hertular's Initial Meetings with DEA Agent Williams

In mid-2001, Hertular was charged by Belizean authorities with trafficking in 1,161 kilograms of cocaine, which drugs Hertular admitted belonged to him and were destined for the United States. After securing bail release, Hertular initiated cellular telephone contact with Special Agent Vincent Williams, then assigned by the Drug Enforcement Administration ("DEA") to Belize to investigate drug trafficking between that country and the United States. At that time, Agent Williams had never met Hertular, much less given him the agent's unlisted cell phone number.

As a result of the call, Agent Williams and Hertular met on September 18, 2001, at which time Hertular expressed an interest in cooperating with United States authorities. Hertular generally described his drug trafficking operation, identifying various Belizean

4

government officials as confederates. He admitted to transporting large quantities of cocaine by plane and speedboat from Colombia to Belize and to using VHF radios and satellite phones to communicate with his fellow traffickers during transport operations.

Agent Williams and Hertular met again on December 13, 2001, at which time Hertular gave the agent a VHF radio and satellite phone that he indicated had been used to coordinate a May 2001 cocaine shipment. At this meeting, however, Agent Williams informed Hertular that the DEA would not use him as a confidential informant. The agent had no further contact with Hertular until April 2003.

### 2. April 11, 2003: Hertular's Uncharged Threat to Agent Williams

On April 11, 2003, Agent Williams was surveilling the Belize residence of confidential informant Liston McCord when he observed Hertular entering the premises. Both Agent Williams and McCord testified at trial to the events that ensued.

Specifically, McCord testified that, once inside his home, Hertular told him that a vehicle belonging to DEA agents was parked outside the premises. When McCord feigned indifference, Hertular advised him to get rid of the car.

Moments later, Agent Williams called McCord to inquire about defendant's presence. Although McCord took this call out of Hertular's presence, when the conversation concluded, Hertular asked the informant if he was cooperating with the DEA. McCord denied any such involvement, and Hertular again advised him to get rid of the surveilling

5

agents, going so far as to offer McCord hand grenades to achieve that goal. When McCord responded that there was no need to "get that drastic," Hertular stated that he could get McCord "anything" he wanted. Trial Tr. at 379. Hertular even offered to "get rid of" the agents himself, but McCord declined, stating that he had nothing to hide from the DEA. Id.

After Hertular left McCord's home, Agent Williams followed defendant and signaled him to pull over into a parking lot. There, Agent Williams warned Hertular to "be mindful of his associations." Id. at 540. Agent Williams testified that this incensed Hertular, who replied that he could "associate with anybody he want[ed]" and reminded Agent Williams that he was a guest in Belize. Id. Hertular stated that "he was tired of the DEA and the American Embassy" and that he was "willing to kill a DEA agent or an American Embassy" employee. Id. at 541. In response to this threat, Agent Williams warned Hertular that if he were to "make[] a hit" on the agent, Hertular should "make sure that he does it right the first time because he won't get a second chance." Id.

Agent Williams reported Hertular's threat to American Embassy officials. In response, the Embassy threat level was raised and extra security measures were implemented. For example, Hertular's photograph was circulated to all Embassy employees, and a "two-man rule" was implemented, requiring all agents and Embassy personnel to travel in pairs.

6

### 3. December 25, 2003: Hertular's Charged Threat to Agents Williams and Kelly

By the end of 2003, the DEA had opened a formal investigation into Hertular's drug trafficking activities and was conveying its findings to Assistant United States Attorneys in the Southern District of New York with a view toward securing a federal indictment.

On December 25, 2003, Hertular called DEA Agent Raymond Kelly (recently assigned to Belize) on his cell phone and requested a meeting near the residence of another DEA agent. Agent Kelly's cell phone number, like that of Agent Williams, was unlisted and should have been unavailable to Hertular. Similarly, there was no obvious way in which Hertular could have obtained the residential addresses for DEA agents stationed in Belize.

Agents Kelly and Williams met Hertular that same day at the designated site. As the three men sat in Kelly's car, Hertular stated that he knew he was the subject of a DEA investigation and that an indictment was likely to be returned against him in the near future. He told the agents that "he didn't want [that] to occur." Id. at 549. When Agent Kelly denied any investigation, Hertular promptly rebutted the denial by playing the tape recording of an intercepted conversation between Kelly and a confidential DEA informant regarding Ralph Fonseca, a senior Belizean government official with whom Hertular was suspected of trafficking drugs. Hertular explained that DEA telephones – both cellular and landline – had been tapped, that a call had been intercepted between Agent Williams and an Assistant United States Attorney discussing the possibility of Hertular's indictment, that individuals

7

within the American Embassy routinely provided Hertular with information, and that he knew the identities of several DEA informants. Hertular stated that he wanted the investigation against him stopped, in return for which he would consider cooperating with the DEA.

In the ensuing conversation, Hertular admitted that, since 1987, he had been a member of the "Fonseca organization," a group involved in drug trafficking and money laundering in the United States and Europe. Hertular implicated a former Belizean prime minister and police commissioner in the organization and identified the Belize Alliance Bank as the entity used for money laundering. Hertular stated that his further cooperation would depend on DEA agreeing in writing to various demands, for example, allowing defendant to live in Europe. The agents indicated that they would have to consult with their superiors and the prosecutors. Meanwhile, they asked Hertular for a copy of the recorded conversation that he had played for them.

Hertular left the scene to make a copy of the requested recording. When he returned a half hour later, his attitude was confrontational. Specifically, Hertular refused to give the agents a copy of the requested tape, stating that he intended to give it instead to Fonseca. Further, Hertular made statements to the agents that are the basis for the § 111 charge in this case. Specifically, Hertular told the agents it would be in their "best interest to back down from this investigation because he would have to protect himself." Id. at 553. When Agent

8

Kelly asked Hertular if he was suggesting that the safety of DEA agents in Belize was in jeopardy, Hertular replied that the agents better "protect" themselves and "watch [their] backs, because the Fonseca organization would hire hit men from Colombia or Mexico to take [the agents] out." Id. Agent Kelly dismissed Hertular's threats with an expletive, whereupon the agents ended the meeting.

The agents – who lacked arrest authority in Belize – did not attempt to take Hertular into custody for threatening their lives. They did, however, advise Embassy officials of these threats. As a result, not only was the two-man rule again put into effect, but additional DEA agents and arms were dispatched to Belize, guards were stationed outside agents' homes, new procedures were implemented for agents leaving their homes or driving around town, and all agents were required to use phone cards, rather than their cell phones, to conduct business.

B.   Court Proceedings Against Hertular

1.   Arrest, Extradition, and Trial

On January 7, 2004, approximately two weeks after the events just detailed, a grand jury sitting in the Southern District of New York returned an indictment charging Hertular with two counts of drug trafficking, forcibly impeding and intimidating a federal officer, and obstruction of justice. In response to a formal request from the United States, Belizean authorities arrested Hertular on January 27, 2004, and, on or about July 24, extradited him to the Southern District of New York to face trial. Hertular was tried on a superseding

9

indictment and, on March 1, 2006, a jury found him guilty on the four counts for which he now stands convicted.[2]

2.      Sentencing

Hertular's pre-sentence report recommended an offense level of 45, which, with a criminal history of I, yielded a Guidelines sentencing range of life imprisonment. Defendant disputed this calculation insofar as his offense level reflected a two-point enhancement for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1) and another two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. As to the first challenge, Hertular argued that there was no evidence that he ever actually possessed the grenade he offered to supply McCord. As to the second, he submitted that a § 3C1.1 enhancement would constitute impermissible double counting in light of his conviction for obstruction of justice. The district court rejected both arguments as meritless. Moreover, because it concluded that the obstruction of justice enhancement was "surely appropriate," the district court observed that the weapon possession enhancement was irrelevant as Hertular's Guidelines range would have provided for life imprisonment even at offense level 43. Sentencing Tr. at 14 (Mar. 22, 2007).

_____

[2] The superseding indictment added no new charges against Hertular. To the contrary, with respect to 18 U.S.C. § 111, it deleted the charge for attempting to impede and intimidate a federal official, leaving only the charge of actually impeding and intimidating. Other changes effected by the superseding indictment — the substitution of a "hand grenade" for "hand grenades" and the inclusion of the word "forcibly" in the § 111 count — clarified the original charges but did not change them.

The district court did not, however, sentence Hertular to life imprisonment. After hearing from the parties as to how the factors specified in 18 U.S.C. § 3553(a) should be weighed, the district court decided that a non-Guidelines sentence was sufficient to serve the sentencing goals identified in that statute. Accordingly, it sentenced Hertular to prison terms of 400 months on each of the two drug trafficking counts, 12 months for forcibly impeding a federal officer, and 120 months for obstruction of justice, all terms to run concurrently.

II.     **Discussion**

A.      The Sufficiency Challenges

Hertular asserts that the trial evidence was insufficient to support the jury's guilty verdicts on the counts of forcibly impeding or intimidating a federal officer and obstruction of justice. The rule of constitutional sufficiency derived from the Due Process Clause states that no person may be found guilty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged." In re Winship, 397 U.S. 358, 364 (1970); see also Jackson v. Virginia, 443 U.S. at 318-19. A defendant raising a sufficiency challenge bears a heavy burden because, while we review such a claim de novo, we consider the evidence "in the light most favorable to the prosecution," and we will uphold a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original); accord United States v. Jones, 531 F.3d at 168; United States v. Hardwick, 523 F.3d 94, 100 (2d Cir. 2008).

11

Applying this stringent test, we conclude that the evidence was insufficient to support Hertular's conviction for forcibly impeding a federal officer but sufficient to support his conviction for obstruction of justice.

### 1.        Forcibly Impeding or Intimidating a Federal Officer

Title 18 U.S.C. § 111(a)(1) states that any person who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes" with a federal officer while the officer is "engaged in or on account of the performance of official duties" is guilty of a crime.[3] Hertular asserts that the trial evidence was insufficient to satisfy the statute's "force" element because no proof was adduced that his threats to murder DEA agents posed immediate harm. As discussed below, our precedent applying § 111 to threats requires some proof of the assailant's present ability to inflict injury giving rise to an objectively reasonable apprehension of immediate harm. Because such proof was lacking in this case, we are

---

[3] Where the proscribed conduct involves "only simple assault," the crime is a misdemeanor punishable by a term of imprisonment of "not more than one year." 18 U.S.C. § 111(a) (2003). Because the government acknowledges that this was the maximum sentence faced by Hertular, we review defendant's sufficiency challenge as it applies to a misdemeanor violation of the statute and not as it might apply to felony or aggravated-felony offenses. See id.; see also United States v. Chestaro, 197 F.3d 600, 606 (2d Cir. 1999) (discussing § 111 crimes after statute's 1994 amendment and identifying physical contact as requirement to sustain § 111(a) felony conviction); 18 U.S.C. § 111(a) (2008) (providing for felony conviction where proscribed conduct "involve[s] physical contact . . . or the intent to commit another felony"). Further, because we vacate Hertular's § 111(a) conviction, we need not consider possible error in the imposition of a $100 special assessment – the amount appropriate for a felony crime, see 18 U.S.C. § 3013(a)(2)(A) – for this misdemeanor offense.

12

obliged to identify merit in this part of Hertular's sufficiency challenge and to reverse his conviction on the § 111 count.

As the Supreme Court has observed, Congress's purpose in enacting § 111 was expansive: "to protect both federal officers and federal functions . . . [ . I]ndeed, furtherance of the one policy advances the other." United States v. Feola, 420 U.S. 671, 679 (1975); United States v. Walker, 835 F.2d 983, 987 (2d Cir. 1987) (noting § 111 purpose "to deter harm to certain federal officials and to deter interference with their law enforcement activities"); United States v. Sommerstedt, 752 F.2d 1494, 1497 (9th Cir. 1985) ("The goal of Congress in enacting [§ 111] was to give maximum protection to federal officers." (internal quotation marks omitted)). Nevertheless, in United States v. Bamberger, this court recognized, in accordance with general principles of statutory construction, that "[t]he word 'forcibly' in section 111" necessarily "limit[ed] the proscribed acts to fewer than would fit the definition of the unmodified verbs alone." 452 F.2d 696, 699 (2d Cir. 1971).

In Bamberger, we declined to construe the statute's force element so narrowly as to require the actual use of physical force to support a § 111 conviction. We held that threats of force could also support a § 111 conviction in certain circumstances. See id. For a threat to satisfy the force element of § 111, however, we required proof that the alleged threat would objectively inspire fear of pain, bodily harm, or death that is likely to be inflicted immediately. See United States v. Walker, 835 F.2d at 987.

13

Those core principles still inhered in the statute after its 1994 amendment, which, in relevant part, used the term "simple assault" to classify a misdemeanor violation. 18 U.S.C. § 111 (2003). As we noted in United States v. Chestaro, 197 F.3d 600 (2d Cir. 1999), that term incorporated its common-law definition, which included a "threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." Id. at 605 (internal quotation marks omitted); see also United States v. Delis, — F.3d —, 2009 WL 564126, at *4 (2d Cir. Mar. 5, 2009) (discussing common-law meaning of assault). Thus, in United States v. Temple, 447 F.3d 130, 136, 139 (2d Cir. 2006), we applied Walker in reviewing a sufficiency challenge to a § 111 misdemeanor conviction. In sum, our precedents – from Bamberger through Temple – endorse the principle that, for a threat to qualify as a § 111(a) misdemeanor offense, the government must prove that the defendant instilled (1) a reasonable apprehension of bodily harm (2) likely to be inflicted immediately.

In its appellate brief, the government devotes considerable effort to demonstrating that Hertular's statements to Agents Kelly and Williams satisfy the first prong of this test, a point that defendant does not – and could not – dispute. The trial evidence would certainly permit a reasonable jury to find that Hertular's threats were real and that he had the ability to put them into effect. Thus, the threats could instill an objectively reasonable fear of pain, bodily harm, or death in any United States official stationed in Belize who heard them. Indeed, to

14

the extent subjective responses can be relevant to objective assessments, the significant protective actions taken by United States authorities in Belize in response to Hertular's charged threats support this conclusion. See United States v. Walker, 835 F.2d at 987 (observing that "the victim's subjective state of mind is not irrelevant to determining whether the amount of force threatened or displayed was sufficient to make fear reasonable"). Thus, Hertular's sufficiency challenge necessarily focuses only on the second prong of the test described above, which requires some evidence that, at the time the charged threats were made, it was apparent that defendant had sufficient present ability to act on them to instill in the agents an objectively reasonable apprehension of immediate harm. See United States v. Temple, 447 F.3d at 139-40; United States v. Chestaro, 197 F.3d at 605.

Discussing this immediacy requirement in Temple, we stated that "[a]n implied threat to use force sometime in the indefinite future" is insufficient to support a § 111 conviction. United States v. Temple, 447 F.3d at 139. In that case, the victim received a voice mail message stating, "'I'm gonna f[***] you up.'" Id. at 140. We ruled that such a temporally vague threat "did not pose the sort of immediate or imminent harm required by the statute." Id. In so holding, we noted that most convictions under § 111 involved "face-to-face encounters." Id. We did not, however, suggest that every face-to-face threat would necessarily satisfy the immediate or imminent harm requirement for a § 111 conviction. Indeed, a contrary conclusion must be drawn from Temple's approving citation to dictum in

15

United States v. Walker, which, in the context of a face-to-face encounter, see 835 F.2d at 985, 987, indicated that a jury considering a § 111 count might appropriately be charged that a threat of bodily harm in the future, such as "'I will get you after work,'" would not be sufficient to support a guilty verdict, United States v. Temple, 447 F.3d at 140 (quoting United States v. Walker, 835 F.2d at 988). Thus, even in the case of a face-to-face encounter, the immediacy requirement demands some evidence that the threat was "accompanied by an apparent present ability to inflict the injury." Id. at 139 (emphasis added); see United States v. Bamberger, 452 F.2d at 699 (observing that threat of harm is not "forcible" unless it is a "present" threat that defendant has the ability to carry out immediately).

The Eleventh Circuit has similarly construed § 111, holding in United States v. Fallen that the threat to inflict the injury must be "coupled with an apparent present ability" actually to inflict it. 256 F.3d 1082, 1088 (11th Cir. 2001) (internal quotation marks omitted). Fallen concluded that the "apparent present ability" requirement was satisfied in that case by evidence that the defendant had not only threatened to kill agents if they did not leave his property but had stated that he was in possession of a firearm. Id. at 1086-87.[4]

---

[4] The Eleventh Circuit rejected Fallen's argument that his failure to display a firearm precluded a finding of immediacy. The court sensibly observed that "concealed assailants who assert that they are in possession of a loaded firearm do so at their peril. When the totality of the circumstances supports a reasonable inference that the assailant is armed, a law enforcement officer is entitled to take the assailant at his word." United States v. Fallen, 256 F.3d at 1089. Nevertheless, the court considered it notable that Fallen had shouted his threats

16

The facts in this case are not at all akin to Fallen. When Hertular told Agents Kelly and Williams that it was in their interest "to back down" from their investigation into his narcotics trafficking "because he would have to protect himself," he did not indicate by word or deed that he was then armed or even that he was contemplating any present action against the agents. Trial Tr. at 553. Rather, Hertular threatened the agents with death at some unspecified future time, telling them to "watch [their] backs," because if they continued to conduct their investigation, "the Fonseca organization would hire hit men from Colombia or Mexico to take [them] out." Id. This is somewhat analogous to the threat of future harm referenced in the jury charge approved in Walker to illustrate circumstances inadequate to support a § 111 conviction. See United States v. Walker, 835 F.2d at 988; see also United States v. Temple, 447 F.3d at 140.

The government nevertheless argues that a jury could have inferred from the totality of the circumstances that it was objectively reasonable for the agents to have feared immediate harm. Hertular was, after all, a large-scale drug trafficker who had, on two occasions, explicitly threatened to kill United States officials. He communicated the charged threat at a meeting with the agents that took place at night in a car in a foreign country in a relatively deserted area. Moreover, Hertular had demonstrated his ability to gain access to

---

from "just on the other side of the door, looking at the agents through a window" – a site from which he could presumably have fired a deadly shot – and not "from deep within the house or from his backyard." Id. It is not clear whether the Eleventh Circuit thought this notable distinction to be determinative, and we need not address that question on this appeal.

17

DEA agents' private telephone numbers and home addresses. Further, he had offered to supply another person with a deadly weapon, a hand grenade, to get rid of DEA agents, a fact that Agent Williams knew at the time of Hertular's charged threat.

To be sure, these circumstances would have instilled in the agents an objectively reasonable fear that Hertular's homicidal threats were serious and real. Under our precedents, however, that is not sufficient to permit a reasonable factfinder to conclude that the agents were being threatened with immediate harm. Hertular's threats implied two conditions precedent to the execution of his homicidal threats: (1) the DEA would have to continue its investigation into Hertular's activities and, if it did, (2) the Fonseca organization would hire hitmen in other countries and transport them to Belize to carry out the threat. Because such conditions suggest the expected passage of some time, a jury could not reasonably find that, when Hertular threatened the agents, he had the apparent present ability to take their lives so that the agents would have an objectively reasonable fear of immediate harm. No different conclusion is warranted from the agents' on-the-spot dismissal of Hertular's threat. Even if this action might have signaled to Hertular that the DEA would not cease its investigation, Hertular's reference to hiring and transporting hitmen from other countries, coupled with the total lack of evidence that Hertular was then armed or ready to take action against the agents, precluded a jury finding that the agents faced an objectively reasonable threat of immediate harm. See United States v. Temple, 447 F.3d at 140; United

18

States v. Walker, 835 F.2d at 988.

In identifying a sufficiency defect with respect to Hertular's § 111 conviction, we by no means suggest that persons may threaten the lives of federal law enforcement officers with impunity, as long as they do not signal a present ability to inflict bodily harm. Quite the contrary. As this court noted at oral argument, 18 U.S.C. § 115(a)(1)(B) criminalizes "threaten[ing] to assault, kidnap, or murder . . . a Federal law enforcement officer . . . with intent to impede, intimidate, or interfere with . . . the performance of official duties." Because this statute contains no force element, there is no burden to prove a defendant's present ability to execute the threat giving rise to an objectively reasonable fear of immediate bodily harm.

In a post-argument submission, the government concedes that "on its face," § 115(a)(1)(B) covers Hertular's conduct. Government's June 20, 2008 Rule 28(j) Letter at 1. It notes simply that conduct can violate more than one statute, and it urges us to uphold the § 111 conviction in light of our recognition that the statute's purpose is to "'prohibit[ ] any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties.'" Id. at 2 (quoting United States v. Walker, 835 F.2d at 987). This excerpt from our Walker decision cannot be read in isolation. Specifically, it cannot override our precedents holding that threatened conduct satisfies the force element of § 111 only when there is some evidence of the defendant's present ability to execute the

19

threat so as to give rise to an objectively reasonable fear of immediate harm. Because such evidence is lacking in this case, we are compelled to reverse Hertular's § 111 conviction.

### 2. Obstruction of Justice

To the extent the same threatening conduct was the basis for Hertular's obstruction conviction pursuant to 18 U.S.C. § 1512(b)(3),[5] defendant submits that the trial evidence was insufficient to permit a reasonable jury to find the requisite specific intent to interfere with the communication of information relating to the commission of a federal offense to a United States law enforcement officer. See United States v. Genao, 343 F.3d 578, 586 (2d Cir. 2003) (noting that § 1512(b)(3) conviction requires "a specific intent to interfere with the communication of information"). Hertular argues that the evidence at most demonstrated an intent to stop the agents from pursuing an indictment against him. This challenge merits little discussion.

---

[5] That statute provides, in relevant part,

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to – . . .

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . .

shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3).

20

The trial evidence shows that, on December 25, 2003, when Hertular threatened the lives of DEA agents, he knew that, in pursuit of an indictment against him and his confederates, information was regularly being communicated by confidential informants to DEA agents in Belize and from DEA agents to federal prosecutors in New York. Indeed, Hertular advised the agents that tape recordings of such conversations had been intercepted, and he even played one such recording for them. On this record, a reasonable factfinder could easily have concluded that when Hertular told the agents it was in their "best interest to back down" from their investigation and warned them that "hit men from Colombia or Mexico" would be hired to "take [them] out," Trial. Tr. at 553, his specific intent was to hinder or prevent not simply the filing of an indictment but any communication to or among federal law enforcement officials that could lead to his indictment. See generally United States v. Veal, 153 F.3d 1233, 1245 (11th Cir. 1998) (observing that § 1512(b)(3) criminalizes threats intended to prevent person "from being an eyewitness or investigating official" with regard to federal crime under investigation). Accordingly, we reject Hertular's sufficiency challenge to his obstruction conviction as patently without merit.

B.     The Jury Instruction Challenge

In charging the jury as to the specific intent element of obstruction of justice under 18 U.S.C. § 1512(b), the district court gave the following instruction:

> By specific intent, I mean that the defendant must have acted knowingly and
> with the unlawful intent to hinder, delay or prevent the communication to a

21

> federal law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense. The defendant must have known or foreseen that the information was likely to result in or affect a judicial proceeding. However, the government need not prove that an official proceeding was pending or about to be instituted at the time of the defendant's actions. I instruct you that a criminal prosecution, of which an indictment is a part, qualifies as a judicial proceeding.

Trial Tr. at 983-84 (emphasis added). Hertular submits that the emphasized language manifests error because the language of § 1512(b), unlike that of other obstruction statutes, does not specify an intent to affect an official or judicial proceeding. See, e.g., 18 U.S.C. § 1510(d)(1) (specifying "intent to obstruct a judicial proceeding"); id. § 1512(a)(1)(A) (referencing intent to "prevent the attendance or testimony of any person in an official proceeding"); id. § 1512(a)(1)(B) (requiring intent to "prevent the production of a record . . . in an official proceeding"); id. § 1513(a)(1)(B) (making it federal crime to kill or attempt to kill "with intent to retaliate against any person" for providing specified information to law enforcement officer "pending judicial proceedings"). The argument is unconvincing for at least two reasons.

First, Hertular not only failed to object to the challenged charge – an omission that would normally limit our review to plain error, see Fed. R. Crim. P. 30(d), 52(b) – his counsel specifically "endorse[d]" it. Trial Tr. at 838 (stating, in response to government request to add highlighted language to charge, "With respect to that change, I endorse that change."). Such endorsement might well be deemed a true waiver, negating even plain error

22

review. See generally United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007) (discussing "true waiver" concept). As this court observed in United States v. Giovanelli, a defendant who has "invited" a challenged charge "has waived any right to appellate review." 464 F.3d 346, 351 (2d Cir. 2006) (internal quotation marks omitted); United States v. Ferguson, 758 F.2d 843, 852 (2d Cir. 1985) (observing, in discussing "invited error," that when defendants obtain "precisely what they affirmatively sought, it ill behooves [them] now to complain"); United States v. Young, 745 F.2d 733, 752 (2d Cir. 1984) (holding that "not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge").

Second, even on plain error review, Hertular's challenge fails because he cannot demonstrate that the purported error is plain, much less that he sustained any prejudice or that the fairness, integrity, or public reputation of his judicial proceedings was called into question. See United States v. Olano, 507 U.S. 725, 732-37 (1993) (discussing four prongs of plain error analysis); accord United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (en banc). To be sure, 18 U.S.C. § 1512(f)(1) states that "[f]or purposes of this section," which includes § 1512(b), "an official proceeding need not be pending or about to be instituted at the time of the offense." See United States v. Gonzalez, 922 F.2d 1044, 1055-56 (2d Cir. 1991) (holding that § 1512 reaches conduct intended to prevent communication of information during investigatory stage). Nevertheless, in Arthur Andersen LLP v. United

23

States, a § 1512(b) case, the Supreme Court ruled that there was a difference between saying that a judicial proceeding "need not be pending or about to be instituted" and saying that a proceeding "need not even be foreseen." 544 U.S. 696, 707-08 (2005) (internal quotation marks omitted). The Court ruled that a defendant could not act with the mens rea necessary to violate § 1512(b) if, when engaging in the obstructive conduct "he does not have in contemplation any particular official proceeding in which [the obstructed information] might be material." Id. at 708. Following Arthur Andersen, this court in United States v. Quattrone, 441 F.3d 153, 180-81 (2d Cir. 2006), identified error in an instruction that told a jury that it need not find any nexus between the defendant's actions and the pending investigations to convict him of obstruction pursuant to § 1512(b).

The trial record indicates that the challenged language in this case was proposed by the government, endorsed by the defendant, and included in the charge by the district court in order specifically to ensure the nexus finding specified in Arthur Andersen. To the extent the charge may have imposed an intent requirement beyond that strictly required by Arthur Andersen – a point we need not conclusively decide on this appeal – Hertular does not even attempt to show that he was prejudiced by the district court placing a heavier burden on the government, see United States v. Kaplan, 490 F.3d 110, 124 (2d Cir. 2007) (noting that "defendant asserting plain error" generally "bears the burden of persuasion as to prejudice"), or that the challenged charge seriously affected the fairness, integrity, or public reputation

24

of his judicial proceedings, see United States v. Quinones, 511 F.3d at 316.

Accordingly, even if Hertular's endorsement of the challenged charge did not waive appellate review, we identify no plain error in the district court's § 1512(b) instruction. We therefore affirm the obstruction of justice count of conviction.

C.      The Sentencing Challenge

Hertular submits that his 400-month sentence is infected by procedural error and, in any event, is substantively unreasonable in light of sentences imposed on certain confederates. Because we vacate Hertular's sentence in light of our reversal of his § 111 conviction, we do not decide the question of substantive reasonableness in advance of resentencing. Nevertheless, to facilitate the district court's task on remand, we here explain why we identify no merit in defendant's procedural challenges.

1.      The Decision to Vacate and Remand for Resentencing Makes It Unnecessary to Consider Hertular's Substantive Reasonableness Challenge

Where we overturn one or more counts of conviction but leave others in place, our general rule has been to remand for de novo sentencing proceedings. See Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006). As we have explained,

> A district court's sentence is based on the constellation of offenses for which the defendant was convicted and their relationship to a mosaic of facts, including the circumstances of the crimes, their relations to one another, and other relevant behavior of the defendant. When the conviction on one or more charges is overturned on appeal and the case is remanded for resentencing, the constellation of offenses of conviction has been changed and the factual

25

mosaic related to those offenses that the district court must consult to determine the appropriate sentence is likely altered. For the district court to sentence the defendant accurately and appropriately, it must confront the offenses of conviction and facts anew.

United States v. Quintieri, 306 F.3d 1217, 1227-28 (2d Cir. 2002); accord United States v. Draper, 553 F.3d 174, 184 (2d Cir. 2009).

In reversing Hertular's § 111 conviction, we recognize that the conduct proved to support this count was clearly criminal under § 1512(b), and most likely under § 115(a)(1)(B). Thus, although our reversal of Hertular's § 111 conviction changes the "constellation of offenses" relevant to sentencing, the "factual mosaic" may be little altered. Nevertheless, mindful that the law entrusts district courts, not courts of appeals, with the primary responsibility for weighing the totality of circumstances relevant to sentencing, we conclude that, even in these circumstances, we must vacate the defendant's sentence and remand the case to the district court so that it may decide, in the first instance, whether a conviction on three rather than four counts affects its assessment of the sentencing factors detailed in 18 U.S.C. § 3553(a).[6]  See Gall v. United States, 128 S. Ct. 586, 596-97 (2007) (recognizing district court's responsibility to decide what weight to accord § 3553(a) factors); United States v. Cavera, 550 F.3d 180, 189, 191 (2d Cir. 2008) (en banc) (noting appellate

---

[6] We express no view as to whether the district court, on resentencing Hertular for the three counts of conviction that we affirm, should impose the same total terms of incarceration and supervision on remand. We have no doubt, however, that the district court will reduce that part of the judgment ordering consecutive special assessments to reflect the reversal of one count of conviction.

26

court's "secondary" role in sentencing; court of appeals "do[es] not consider what weight we would ourselves have given a particular factor," but considers only "whether the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances").

Only when the district court has made that assessment and entered a new final judgment would it be appropriate for a panel of this court to consider the substantive reasonableness of the sentence imposed. If Hertular were to appeal a sentence imposed on remand as substantively unreasonable, he would bear the burden identified by our recent precedents to show that the challenged sentence cannot be located within the "broad range" that can be deemed reasonable. United States v. Jones, 531 F.3d at 174; see United States v. Cavera, 550 F.3d at 189.

### 2. Hertular's Procedural Challenges Lack Merit

Hertular asserts procedural error in the district court's calculation of his Sentencing Guidelines range. See Gall v. United States, 128 S. Ct. at 597. Because these calculations are not affected by our decision to reverse defendant's § 111 conviction, we address these arguments now to facilitate the district court's task on resentencing.

### a. U.S.S.G. § 3C1.1: Obstruction of Justice

Relying exclusively on his argument that the evidence was insufficient to support his convictions either for interfering with and intimidating a federal officer in violation of § 111

27

or for obstruction of justice in violation of § 1512(b)(3), Hertular asserts that the district court erred in enhancing his offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1. It is not clear that Hertular preserved this argument in the district court. See United States v. Gallerani, 68 F.3d 611, 617 (2d Cir. 1995) (holding that objection is preserved for appellate review only when it is articulated in the trial court "with sufficient distinctness to alert the court to the nature of the claimed defect").[7] Even if we were to resolve that question in defendant's favor, however, no relief would be warranted.

First, we observe that "force" is not required to find obstruction under § 3C1.1. Therefore, the sufficiency problem we identify in this element of Hertular's § 111 conviction is irrelevant to the application of § 3C1.1 to defendant's Guidelines calculation.

Second, for the reasons discussed supra at **[20-21]**, we determine that the evidence was sufficient to prove Hertular guilty beyond a reasonable doubt of obstruction of justice in violation of § 1512(b)(3). We therefore easily conclude that the evidence was sufficient to permit the district court to find obstruction by the lesser preponderance-of-the-evidence standard applicable to Guidelines determinations. See United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005) (holding that "[j]udicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker [543 U.S. 220 (2005)]"); accord United

---

[7] In the district court, Hertular did not challenge the sufficiency of the evidence to support a § 3C1.1 enhancement. Rather, he argued that application of § 3C1.1 to his case would involve impermissible "double counting" of crimes of conviction. The latter argument was rejected below and not renewed on appeal.

States v. Jones, 531 F.3d at 176.

        b.      U.S.S.G. § 2D1.1(b)(1): Possession of a Dangerous Weapon

Hertular submits that the district court erred in applying a § 2D1.1(b)(1) enhancement for possession of a dangerous weapon to his offense level calculation. He asserts that there was no evidence to support an inference that he actually possessed the weapon at issue, i.e., the hand grenades he offered to supply McCord. Hertular's argument fails for two reasons.

First, the evidence was sufficient to support an inference that it was more likely than not that Hertular actually or constructively possessed the offered hand grenades. See United States v. Herrera, 446 F.3d 283, 287 (2d Cir. 2006) ("[A] defendant is subject to a two-level enhancement under § 2D1.1(b)(1) for possession of a dangerous weapon if he constructively possessed the weapon by having dominion or control over the item itself, or dominion over the premises where the item was located" (alteration, ellipsis, and internal quotation marks omitted)); see generally United States v. Jones, 531 F.3d at 176, 177 (deferring to district court's "preponderance finding" where probability of certain facts' existence was "more likely than not"). By his own admission, Hertular was a significant drug trafficker in an organization with such deep roots into the Belizean government that co-conspirators could supply him with clandestinely recorded conversations between United States agents assigned to Belize and federal prosecutors in New York. That same organization had sufficiently corrupted employees of the United States Embassy in Belize as to give Hertular access to

29

otherwise unavailable information about the identities of government informants and the residences and contact numbers for DEA agents. Under these circumstances, the evidence was sufficient to support an inference that when Hertular said he could supply McCord with grenades, defendant was not talking idly. See Gall v. United States, 128 S. Ct. at 596 (clarifying that "abuse-of-discretion" standard applies to "appellate review of all sentencing decisions"); United States v. Legros, 529 F.3d 470, 474 (2d Cir. 2008) (explaining that abuse-of-discretion standard reviews questions of fact only for clear error). Rather, Hertular more likely than not had such grenades in his possession, either actually or constructively through co-conspirators. See generally United States v. Paulino, 445 F.3d 211, 222 (2d Cir. 2006) ("Constructive possession exists when a person knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." (emphasis, ellipsis, and internal quotation marks omitted)); cf. United States v. Pimentel, 83 F.3d 55, 58-59 (2d Cir. 1996) (holding that Pinkerton theory of liability applied to prove that defendant "carr[ied]" weapon within meaning of 18 U.S.C. § 924(c)). Indeed, that conclusion is reinforced by the purpose for which Hertular offered the grenades: to remove DEA agents then on McCord's property. Unless Hertular had the grenades in his actual or constructive possession, there would have been no point in offering them to effect a task that defendant urged be achieved promptly.

Second, even if the evidence could not support an offense level increase to 45

pursuant to § 2D1.1(b)(1), that would not, by itself, have made any difference to the calculation of Hertular's Guidelines sentencing range. As the district court observed, an offense level of 43 would also have yielded a recommended lifetime sentence. Thus, any misapplication of § 2D1.1(b)(1) to this case would have constituted a harmless error in the Guidelines calculation not warranting resentencing. See United States v. Lenoci, 377 F.3d 246, 256-57 (2d Cir. 2004) (observing that alleged § 3D1.2(d) grouping error was harmless where offense level would have been same even absent error).

### c. U.S.S.G. § 3B1.1(b): Role Enhancement

Hertular's challenge to the district court's application of a role enhancement to the calculation of his offense level merits little discussion. U.S.S.G. § 3B1.1(b) provides for a three-level enhancement if a defendant "was a manager or supervisor (but not an organizer or leader)" in a criminal activity that involved "five or more participants or was otherwise extensive." Hertular does not dispute that the drug conspiracy for which he was found guilty involved five or more participants. He argues only that he should not have been treated as a manager or supervisor because the enhancement was not applied to a similarly situated confederate prosecuted before a different judge. We are not persuaded.

A defendant is properly considered as a manager or supervisor under § 3B1.1(b) if he "exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants."

31

United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002) (alterations, ellipsis, and internal quotation marks omitted). The fact that other persons may play still larger roles in the criminal activity does not preclude a defendant from qualifying for a § 3B1.1(b) enhancement. See United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997).

In general, we review a district court's determination that a defendant deserves a leadership enhancement under § 3B1.1 de novo, but we review the court's findings of fact supporting its conclusion only for clear error. See United States v. Paccione, 202 F.3d 622, 624 (2d Cir. 2000). Where, as in this case, the defendant did not challenge the application of a § 3B1.1 enhancement before the district court, we review only for plain error. See United States v. Espinoza, 514 F.3d 209, 211-12 (2d Cir. 2008). We identify no such error in this case.

Ample trial evidence supported the district court's conclusion that Hertular had greater responsibility over the organization's drug operations than an average member of the conspiracy. Specifically, Hertular or his confederates acknowledged that defendant dealt directly with both the organization's Colombian suppliers as well as the Mexican transporters. Moreover, Hertular's access to otherwise unavailable information about United States agents working in Belize and their informants, and to recorded conversations involving United States law enforcement officials both in Belize and in New York strongly supported the inference that he dealt with the various corrupt high-ranking officials in the

32

Belize government who were integral to the conspiracy's operations. Further, evidence demonstrated that Hertular recruited and directed persons involved in transporting drugs for the conspiracy. See United States v. Blount, 291 F.3d at 217. Although Hertular now attempts to minimize his involvement with these workers, trial evidence indicated that he communicated with one or more of them through high frequency radios and satellite telephones.

Further reinforcing the conclusion that Hertular played a more significant role in the conspiracy than average participants was the fact that he threatened the lives of federal law enforcement agents investigating him and the conspiracy of which he was a member. On one occasion, he offered to secure hand grenades to perform the deed. On another occasion, he went out of his way to let agents know that he had access to confidential information about them and their informants. The district court was entitled to conclude that no average member of the conspiracy would have taken such aggressive action to protect the ongoing criminal scheme.

Accordingly, we identify no error, let alone plain error, in the district court's use of a § 3B1.1(b) role enhancement to calculate Hertular's Sentencing Guidelines range preliminary to it imposing a non-Guidelines sentence.

D.    The *Pro Se* Challenges

We have reviewed the various challenges raised by Hertular in his pro se filing with the court, and we readily conclude that they either are lacking in merit or cannot properly be considered on this appeal.

First, Hertular's claim that he was never arraigned on the superseding indictment ("S2") is belied by the docket sheet in this case, which contains a minute entry for Hertular's S2 arraignment on February 15, 2006. Moreover, the transcript of proceedings held that day conclusively demonstrates Hertular's arraignment on S2.

Second, Hertular's claim that there were defects in the provisional arrest warrant issued against him by Belizean authorities was a matter properly raised in his extradition proceedings in that country. United States courts do not review challenges to foreign authorities' compliance with their own domestic law in granting a removal request by this country. See generally United States v. Lira, 515 F.2d 68, 71-72 (2d Cir. 1975) (holding that United States authorities "were entitled to rely on [foreign] government's interpretation and enforcement of its own laws. The United States Government did not owe appellant any obligation to enforce his asserted right under Chilean law."); accord United States v. Yousef, 327 F.3d 56, 146 (2d Cir. 2003). To the extent Hertular contends that his trial on a superseding indictment violated that provision of the extradition treaty in force between the United States and Belize providing for prosecution in the receiving country on charges for

34

which extradition was granted, <u>see</u> Extradition Treaty Between the Government of the United States of America and the Government of Belize, art. 14, § 1(a), Mar. 30, 2000, S. Treaty Doc. 106-38 (2000),[8] we need not decide whether Hertular can raise such a challenge to his conviction, <u>see</u> <u>United States v. Cuevas</u>, 496 F.3d 256, 262 (2d Cir. 2007) ("This Court has not conclusively decided whether a defendant has standing to challenge his sentence on the ground that it violates the terms of the treaty or decree authorizing his extradition."). Even if we were to resolve that question in Hertular's favor, we identify no substantive difference between the crimes of conviction and the crimes for which extradition was sought to manifest any treaty violation. <u>See</u> <u>supra</u> at **[10]** n.2.

Third, Hertular's argument that a third indictment was returned in his case and "intentionally with[held]" from him lacks any factual support in the record. Appellant's <u>Pro Se</u> Br. at 10. In any event, the existence of such an indictment would not have precluded Hertular's trial or conviction on S2. <u>See generally</u> <u>United States v. Vavlitis</u>, 9 F.3d 206, 209

---

[8] Article 14, Section 1(a) of the Treaty states:

1.  A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a) the offense for which extradition has been granted or a differently denominated offense based on the same facts on which extradition was granted, provided such offense is extraditable, or is a lesser included offense.

Extradition Treaty Between the Government of the United States of America and the Government of Belize, art. 14, § 1(a), Mar. 30, 2000, S. Treaty Doc. 106-38 (2000).

(1st Cir. 1993) ("It is clear that the grand jury's return of a superseding indictment does not void the original indictment.").

Fourth, Hertular's claim that the government failed in its Rule 16 obligations to produce a diplomatic note regarding his arrest from the United States to the Belizean government is factually belied by the record. A copy of the note in question was produced by the government. See Letter from Marvin E. Schechter, counsel to defendant, to the Honorable Naomi Reice Buchwald, Feb. 27, 2006, at 1 (acknowledging government's production of diplomatic note). Hertular's unsworn and unsupported statement that he saw a different diplomatic note warrants no further inquiry, much less reversal of his conviction.

Fifth, Hertular's assertion that the government suppressed the Belizean search warrant authorizing a search of his brother's home similarly lacks any record support. The record demonstrates that the warrant was, in fact, introduced into evidence at trial. See Trial Tr. at 72.

Finally, Hertular's claim of ineffective assistance of counsel is more appropriately raised on a motion brought under 28 U.S.C. § 2255. See Massaro v. United States, 538 U.S. 500, 504-05 (2003); accord United States v. Iodice, 525 F.3d 179, 186 (2d Cir. 2008). Accordingly, we decline to consider it on this appeal.

III.   **Conclusion**

To summarize, we reach the following conclusions:

36

1. Hertular's conviction for forcibly impeding or intimidating federal officers in violation of 18 U.S.C. § 111 must be reversed because the evidence was insufficient to permit any reasonable jury to make the finding required by our precedents, i.e., that when defendant threatened the lives of DEA agents, he did so with the present apparent ability to carry out the threat so as to give rise to an objectively reasonable fear of immediate harm.

2. Hertular's conviction for obstructing justice in violation of 18 U.S.C. § 1512(b)(3) is supported by sufficient evidence of the requisite intent because, at the same time Hertular threatened the lives of DEA agents if they continued their investigation into his criminal activities, Hertular expressed awareness of their communications with federal prosecutors in an effort to secure his indictment.

3. Hertular's challenge to the jury charge on obstruction of justice fails because (a) his endorsement of the charge in the district court manifests a true waiver precluding appellate review and, in any event, (b) he cannot demonstrate plain error because the alleged defect only increased the government's burden of proof and caused no prejudice to the defendant.

4. Because we reverse Hertular's § 111 conviction, we vacate his sentence and remand for resentencing. Because that resentencing may yield a different sentence, we do not at this time consider Hertular's argument that the vacated sentence is substantively unreasonable. We do, however, reject as without merit Hertular's claim of procedural error

37

with respect to the district court's calculation of his Sentencing Guidelines range, a calculation not affected by our § 111 reversal.

5. Hertular's <u>pro se</u> arguments are either without merit or not properly considered on this appeal.

Accordingly, we reverse Hertular's conviction for violating 18 U.S.C. § 111, we affirm the district court's judgment as to the remaining three counts of conviction, and we vacate that part of the judgment pronouncing sentence and remand the case for the limited purpose of resentencing in light of our reversal of the § 111 count.

AFFIRMED IN PART, REVERSED IN PART, VACATED AND REMANDED IN PART.